Tyler **MURRAY**, by and through his parents and next friends, John and Myrna **MURRAY**, Plaintiff–Appellant, Cross–Appellee,

v.

**MONTROSE COUNTY SCHOOL DISTRICT RE–1J**, a School District of the State of Colorado, Defendant–Appellee, Cross–Appellant.

Center for Law and Education, Inc.; Disability Rights Education and Defense Fund; National Association of Protection and Advocacy Systems; Colorado Developmental Disabilities Planning Council, Amici Curiae.

Nos. 93–1466, 93–1474.

United States Court of Appeals, Tenth Circuit.

April 4, 1995.

Rehearing Denied May 8, 1995.

Michael W. Breeskin (Chester R. Chapman and Kristin A. Kutz with him on the briefs), The Legal Center Serving Persons with Disabilities, Denver, CO, for appellant/cross-appellee.

Susan S. Schermerhorn (Gerald A. Caplan and Alexander Halpern with her on the

briefs), Caplan and Earnest, Boulder, CO, for appellee/cross-appellant.

Maura J. Kelly, Kathleen B. Boundy, and Kathleen Noonan, Center for Law and Educ., Cambridge, MA, on the brief for The Center for Law and Educ. and the Disability Rights Educ. and Defense Fund, amici curiae.

William P. Bethke, Denver, CO, on the brief for the Colorado Developmental Disabilities Planning Council, amicus curiae.

Stewart R. Hakola, Michigan Protection & Advocacy Service, Marquette, MI, on the brief for the National Ass'n of Protection and Advocacy Systems, amicus curiae.

Before ANDERSON and McWILLIAMS, Circuit Judges, and BROWN,* District Judge.

STEPHEN H. ANDERSON, Circuit Judge.

Plaintiff and appellant Tyler Murray, by and through his parents and next friends John and Myrna Murray, appeals from the dismissal of his action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1485, against the Murray County School District, in which he challenged the District's decision to move him from his neighborhood school in Olathe, Colorado, to a school with a program for children with severe disabilities. The District cross-appeals the district court's earlier denial of a previously filed motion for summary judgment. For the following reasons, we affirm.

## BACKGROUND

Tyler Murray ("Tyler") is a twelve-year-old boy with multiple disabilities due to cerebral palsy. His disabilities include significant mental and physical impairments, as well as speech difficulties.[1] Tyler lives in Olathe, Colorado, approximately five blocks from Olathe Elementary School.

In late 1987 and in early 1988, Tyler was tested in anticipation of his commencing kindergarten in the fall of 1988. Olathe Elementary offers basic services to disabled children with "mild to moderate" ("M/M") needs. It offers these services through its two resource teachers, as well as through paraprofessionals and itinerant specialists.[2] When Tyler began kindergarten at Olathe, and until early 1991, the school was not fully accessible to children with disabilities like Tyler's. It is now fully accessible. Another school, Northside Elementary School, located in Montrose, some ten miles from Olathe, has a specific program, implementing the Colorado Effective Education Model ("CEEM"), for children with "severe/profound" needs ("S/P"). It is fully accessible to disabled children. It is one of six elementary schools in Colorado implementing CEEM. Northside also contains regular education classrooms which serve nondisabled children.

In April and October of 1988, a multidisciplinary staffing team at Olathe met to develop an individualized education program ("IEP") for Tyler, as the IDEA requires for each child with disabilities. See 20 U.S.C. §§ 1401(a)(18), 1414(a)(5).[3] The staffing

---

* The Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

1. The Administrative Law Judge made the following findings concerning Tyler's condition:

   His condition causes spastic quadriplegia and severe mobility and coordination deficits, particularly on the left side. His vision is impaired by inability to focus his eyes together. He has generally been able to move only with the aid of assistive devices, human assistance or both. Through much of his school time he has used a three-wheeled device designed so he can work while sitting in it. During the 1990–91 school year, he also learned to use a walker, at least on a limited basis.... He can climb stairs with difficulty and assistance, but

   cannot descend. He has also had difficulty writing, but has now learned to use his right hand while holding the paper with his left. His speech is frequently difficult to understand and he has been working with S/L therapists for several years.

   *Montrose County Sch. Dist. RE–1J v. Murray*, No. Ed. 91–06, slip op. at 7; Appellant's App. Vol. IV at A–0949.

2. Itinerant specialists travel to different schools, offering specialized services to students at those schools for a part of each day.

3. The IEP, the cornerstone of the IDEA's goal of providing an appropriate education for each disabled student, is "a written statement that sets forth the child's present performance level, goals

team determined that Tyler's IEP could be implemented at Olathe. Tyler was in the regular kindergarten class at Olathe for the full two and one-half hour school day, with two to four hours per week of speech and occupational/physical therapy. As of February 1989 he began spending one and one-quarter to three and three-quarters hours per week in the resource room instead of the regular classroom.

The required annual review of Tyler's IEP occurred in May 1989, at which needs and goals were established for first grade.[4] Tyler remained at Olathe in the regular first grade classroom with five hours served in the resource room, one to two hours of speech and language therapy, and one and one-half hours of occupational therapy per week.

In January 1990 Tyler's IEP was reviewed because the staff at Olathe were concerned that he was not progressing as well as expected, and that his current educational placement might be inappropriate. His time in special education services was increased, and his curriculum was modified.

Tyler had surgery in July 1990, and spent six weeks in a cast, which caused him to regress in certain areas and made it difficult for him to meet his IEP goals during that time period.

At a meeting in August 1990, between the Murrays, Donald Binder, the Director of Student Services for the District, and others, District personnel suggested that the CEEM program at Northside might be a more appropriate placement for Tyler. The Murrays expressed their strong preference that Tyler remain at Olathe, where his sibling and neighborhood friends attended school.

At a triennial review held on November 27, 1990, Tyler's IEP was carefully reviewed and modified, and the staffing team discussed alternative placements, comparing the benefits of Olathe and Northside.[5] At that time, Tyler was in second grade, but his academic level was determined to be kindergarten in some areas, and beginning first grade in others. Appellant's App. Vol. I at A–0044; Vol. IV at A–0730. His greatest area of strength was in social skills and interaction.

The staffing team was polled, and the Olathe psychologist, one of the resource teachers, the Olathe school principal, Tyler's regular classroom teacher at Olathe, and Mr. Binder all voted to place Tyler at Northside. Mr. Binder testified that the reasons for recommending placement at Northside were that the severe needs program was more appropriate for Tyler and that Olathe was not physically as accessible as Northside. Tyler's parents, his occupational therapist, his physical therapist, and his speech therapist all voted to have Tyler remain at Olathe. It is apparently undisputed that all members of the staffing team, and Tyler's parents, agreed on the needs, goals, and objectives contained in the IEP and that Tyler should spend most of his time outside the regular classroom setting.

On December 13, 1990, Mr. Binder sent the Murrays a letter indicating the District's intent to move Tyler to Northside, effective January 7, 1991, and informing the Murrays of their right to challenge that decision in a due process hearing.[6] The Murrays requested such a due process hearing before an independent hearing officer ("IHO"), as permitted by the IDEA, 20 U.S.C. § 1415(b)(2), as well as an independent educational and psychological evaluation of Tyler.

and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Association for Community Living v. Romer*, 992 F.2d 1040, 1043 (10th Cir.1993); *see* 20 U.S.C. § 1401(a)(20).

4. The IDEA requires each child's IEP to be reviewed at least annually. 20 U.S.C. §§ 1401(a)(20)(B), 1414(a)(5).

5. Mr. Binder described a triennial review as a "reevaluation" of the student, designed to deter-

mine whether the child continues to need special education services, and, if so, the dimension of those services. Appellant's App. Vol. I at A–0037–38. Tyler's triennial review was preceded by assessments of him, conducted by all district personnel who worked with him.

6. Because the staffing team could not reach consensus on the appropriate placement for Tyler, the ultimate decision fell to Mr. Binder as the director of special education.

Following Tyler's evaluation by Dr. Sally Rogers, the staffing team reconvened in March 1991, along with Dr. Rogers, and prepared an addendum to Tyler's IEP, which made some clarifications and added some goals and objectives, primarily academic.[7] Nonetheless, the same majority of the team voted for placement at Northside, with the addition that the Olathe social worker also recommended placement at Northside. The Murrays continued to express their strong preference that Tyler remain at Olathe.

Because the matter remained unresolved, the due process hearing took place on March 25–27, 1991. The IHO determined that Olathe was providing an appropriate education for Tyler. The District appealed that decision to an administrative law judge ("ALJ"), who reversed the IHO's decision, holding that Tyler had not achieved any meaningful educational progress at Olathe and that Northside was the appropriate placement for him.

The Murrays thereafter filed a complaint in district court challenging the ALJ's decision. *See* 20 U.S.C. § 1415(e)(2). The District moved for summary judgment on November 22, 1991, which the district court denied on April 14, 1992. On August 11, 1992, the District moved to dismiss the complaint in part or for partial summary judgment, and the Murrays moved for partial summary judgment. On October 21, 1993, the district court granted the District's motion, affirmed the ALJ's decision, and dismissed the Murrays' claim.

The Murrays filed a notice of appeal from the dismissal of their claims, and the District filed a cross-appeal from the district court's denial of its November 22, 1991, motion for summary judgment. The Murrays have filed a motion to dismiss the cross-appeal, on the ground that the District, as the ultimately prevailing party, lacks standing to appeal an interlocutory order against it. Tyler has re-

mained at Olathe throughout this entire period. He was evaluated in November of 1993, and the staffing team determined at that time that his IEP could be implemented at Olathe.[8]

## DISCUSSION

### I. *IDEA*

"The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to 'a free appropriate public education ... designed to meet their unique needs.'" *Association for Community Living,* 992 F.2d at 1042–43 (quoting 20 U.S.C. § 1400(c)); *see also Board of Educ. v. Rowley,* 458 U.S. 176, 181, 102 S.Ct. 3034, 3038, 73 L.Ed.2d 690 (1982); *Beard v. Teska,* 31 F.3d 942, 950 (10th Cir.1994). The IEP is the basic mechanism through which that goal is achieved for each disabled child. *See* 20 U.S.C. § 1401(a)(20); *see also Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988). The IDEA contains both extensive procedural requirements designed to ensure that an IEP is properly developed for each child and that parents or guardians have significant involvement in the educational decisions involving their children, as well as substantive requirements designed to ensure that each child receives the "free appropriate public education" mandated by the Act.

Thus, a school district must give prior written notice whenever it proposes to change, or it refuses to change, any aspect of a child's education. 20 U.S.C. § 1415(b)(1)(C). A parent wishing to challenge a school district decision is entitled to an impartial due process hearing conducted by a state, local or intermediate educational agency. 20 U.S.C. § 1415(b)(2). *See Association for Community Living,* 992 F.2d at 1043. Appeal from the local or intermediate level to the state level is permitted, and parents may further appeal the state's deci-

---

7. Dr. Rogers' assessments of Tyler's cognitive and educational abilities were consistent with the District's assessments. Appellant's App. Vol. I at A–0083.

8. Thus, Tyler is currently at Olathe pursuant to his IEP. We asked the parties to brief the question of whether Tyler's placement, pursuant to

the November 1993 evaluation, rendered moot any issues in this case. As we discuss, *infra,* his placement renders moot certain issues before us, but does not render the entire case moot. Nothing in the supplemental briefs convinces us otherwise.

sion in state or federal court. 20 U.S.C. § 1415(e)(2).

Among the most important substantive requirements of the IDEA is the obligation to educate disabled children in the "least restrictive environment" in which they can receive an appropriate education. To that end, 20 U.S.C. § 1412(5)(B) provides in pertinent part:

> [T]o the maximum extent appropriate, children with disabilities ... [must be] educated with children who are not disabled, and ... special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [shall] occur[ ] only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily....

This requirement is known as the "least restrictive environment" or "LRE" requirement.[9]

## A. LRE STANDARDS

The Supreme Court has not addressed how courts evaluate whether the LRE requirement of section 1412(5)(B) has been met. Three standards have emerged from the circuit courts. See generally Dixie Snow Huefner, The Mainstreaming Cases: Tensions and Trends for School Administrators, 30 Educ.Admin.Q. 27 (1994); Ralph E. Julnes, The New Holland and Other Tests for Resolving LRE Disputes, 91 Educ.L.Rep. 789 (1994).[10] While the Murrays urge us to

9. The term "mainstreaming" is also frequently used, often interchangeably, with the term LRE. In fact, they are different. "Mainstreaming" means placing disabled children in regular classrooms, with non-disabled children. The IDEA does not require mainstreaming in all cases; "rather, it requires that each student be educated in an environment that is the least restrictive possible and that removal from general education occurs only when absolutely necessary." Allan G. Osborne, Jr., The IDEA's Least Restrictive Environment Mandate: A New Era, 88 Educ. L.Rep. 541 (1994). The term "inclusion" is increasingly favored over the term "mainstreaming" because "mainstreaming connotes 'the shuttling of the disabled child in and out of the regular class without altering the class to accommodate the child.'" Abigail L. Flitter, Civil Rights—A Progressive Construction of the Least Restrictive Environment Requirement of the Individuals with Disabilities Education Act—Oberti ex. rel. Oberti v. Board of Educ., 995 F.2d 1204 (3d Cir.1993), 67 Temp.L.Rev. 371 n. 5 (1994) (quoting Oberti, 995 F.2d at 1207 n. 1).

10. The Third, Fifth and Eleventh Circuits have adopted what is called the Daniel R.R. test, following Daniel R.R. v. Board of Educ., 874 F.2d 1036 (5th Cir.1989): the court first determines "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily ... [and, if not] whether the school has mainstreamed the child to the maximum extent appropriate." Id. at 1048; see also Oberti v. Board of Educ., 995 F.2d 1204, 1215 (3d Cir.1993); Greer v. Rome City Sch. Dist., 950 F.2d 688, 696 (11th Cir.1991). Courts consider the following factors in determining whether the first prong of the test has been met: (1) what steps the school has taken to accommodate the child in the regular classroom; (2) whether the child will receive an educational benefit from regular education; (3) the child's

overall educational experience in regular education; and (4) the effect on the regular classroom of the disabled child's presence in the classroom. Daniel R.R., 874 F.2d at 1048–49. The Oberti and Greer courts have combined the second and third factors into a comparison of the educational benefits of the regular classroom with those of the special education classroom. See Oberti, 995 F.2d at 1216; Greer, 950 F.2d at 697. Greer also permitted a consideration of the cost of any supplemental aids and services required for placement in the regular classroom. Greer, 950 F.2d at 697.

The Fourth, Sixth and Eighth Circuits apply what is called the Roncker test, named after Roncker v. Walter, 700 F.2d 1058 (6th Cir.), cert. denied, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983): "[W]here the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act." Id. at 1063; see also Devries v. Fairfax County Sch. Bd., 882 F.2d 876, 879 (4th Cir.1989); A.W. v. Northwest R–1 Sch. Dist., 813 F.2d 158, 163 (8th Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987). The factors to be considered under Roncker are: (1) the benefits the child would receive from the special education classroom as compared with those from the regular classroom; (2) whether the child would be disruptive in the regular classroom; and (3) the cost of maintaining the child in the regular classroom. Roncker, 700 F.2d at 1063.

The Ninth Circuit has approved a test applying factors from both Daniel R.R. and Roncker: to determine whether a child is appropriately placed, the court applies a four-factor balancing test: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [the

adopt one of these standards, as we discuss further *infra*, we need not do so to resolve this case.

## B. *JUDICIAL REVIEW IN IDEA CASES*

As indicated, parents may challenge a school district placement decision through the due process hearing proceeding and subsequent appeal to the state administrative level, followed by further appeal to the federal district court. *See* 20 U.S.C. § 1415(e)(2).

### 1. *Standard of Review*

The Ninth Circuit recently observed that "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994). The IDEA specifically requires a district court reviewing a challenge under the IDEA to "receive the records of the administrative proceedings, ... hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence," grant any appropriate relief. 20 U.S.C. § 1415(e)(2). Thus, the court does not use the substantial evidence standard typically applied in the review of administrative agency decisions, "but instead must decide independently whether the requirements of the IDEA are met." *Board of Educ. v. Illinois State Bd.*, 41 F.3d 1162, 1167 (7th Cir.1994).

■ However, "[t]he fact that § 1415(e) requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051 (quoting 20 U.S.C. § 1415(e)(2)). The district court must therefore independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving "due weight" to the administrative proceedings below. This has been described as a "modified de novo review," *Doe v. Board of Educ.*, 9 F.3d 455, 458 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994), or as "involved oversight." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir.1993) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 989 (1st Cir.1990), *cert. denied,* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991)); [11] *cf. Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir.1993) ("district court's review of the hearing officer's decision is virtually *de novo* ").

■ In this case, we review the district court's grant of summary judgment to the

---

child] ha[s] on the teacher and children in the regular class; and (4) the costs of mainstreaming [the child]." *Sacramento Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994); *see also Clyde K. v. Puyallup Sch. Dist. No. 3*, 35 F.3d 1396, 1401 (9th Cir. 1994). The Ninth Circuit has not expressly adopted the second prong of the *Daniel R.R.* test—if education in the regular classroom, with supplemental aids and services, cannot be satisfactorily achieved, has the child nonetheless been mainstreamed to the maximum extent appropriate?

11. The First Circuit has carefully described the district court's obligation as one designed to render a "bounded independent decision[ ]—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Roland M.*, 910 F.2d at 990 (quoting

*Town of Burlington v. Department of Educ.*, 736 F.2d 773, 791 (1st Cir.1984), *aff'd on other grounds,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)); *see also Ojai Unified Sch. Dist.*, 4 F.3d at 1473–74. In *Johnson v. Independent Sch. Dist. No. 4*, 921 F.2d 1022, 1026 n. 2 (10th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 79 (1991), we noted that courts need not "assume deference to the administrative hearing officer's decision under the Act...." *Cf. Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991) ("findings of fact by the hearing officers ... are entitled to be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it."); *see also Combs v. School Bd.*, 15 F.3d 357, 361 (4th Cir.1994) (giving "deference to the findings of the original administrative factfinder," and holding that "[w]hen both the original hearing officer and the state review officer agree on issues, ... even greater deference is due").

District.[12] We review the grant of summary judgment de novo, applying the same standard as did the district court. *Johnson,* 921 F.2d at 1025. Thus, summary judgment is only appropriately granted if " 'there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.' " *Id.* (quoting Fed.R.Civ.P. 56(c)). We examine the facts and draw any inferences therefrom in favor of the non-moving party. We of course review de novo the district court's interpretation of the statutes at issue. *See Dell v. Board of Educ.,* 32 F.3d 1053, 1058 (7th Cir.1994).

## II. *ISSUES IN THIS CASE*

The Murrays argue: (1) the LRE requirement of section 1412(5)(B) includes a strong rebuttable presumption that the LRE. is in the neighborhood school, with supplementary aids and services; (2) the Ninth Circuit's LRE standard is the proper standard for evaluating compliance with the IDEA's LRE requirement and under that standard, the district court's decision granting summary judgment to the District was erroneous; (3) the district court erred in not permitting the Murrays to introduce additional evidence of Tyler's progress after the due process hearing and of possible supplementary aids and services. In its cross-appeal, the District argues the district court erred in not granting its first motion for summary judgment. The Murrays seek dismissal of the cross-appeal, arguing the District lacks standing since it prevailed. We hold that a single legal issue controls the outcome of this case—whether the LRE mandate of section 1412(5)(B) includes a presumption that the LRE is in the neighborhood school with supplementary aids and services. We hold that it does not. For reasons more fully discussed below, we need not address the Murrays' other arguments.

## A. *IS THERE A PRESUMPTION OF NEIGHBORHOOD SCHOOLING IN LRE?*

■ The Murrays argue that the LRE mandate includes a presumption that the LRE is in the neighborhood school, with supplementary aids and services. They rely upon the "plain meaning" of the statute; the 1973–1975 legislative history of the IDEA; the wording of two regulations implementing the IDEA; and the 1982–1983 legislative history of the IDEA. We reject these arguments.

The statute requires that

to the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and that special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily....

20 U.S.C. § 1412(5)(B). The Murrays argue that "regular educational environment" implicitly includes neighborhood schools, that "special classes" means non-regular classes; and that "separate schooling" means non-neighborhood schools. They further argue that because Congress has declared that "the neighborhood is the appropriate basis for determining public school assignments," 20 U.S.C. § 1701(a)(2), then the reference to "removal" in section 1412(5)(B) must mean removal from the neighborhood school. Thus, they argue that "supplementary aids and services" must be fully explored before a child is removed from *both* the· neighborhood school *and* the regular classroom with non-disabled children.

This interpretation strains the plain meaning of the statute. The statute clearly addresses the removal of disabled children from classes or schools with nondisabled children. It simply says nothing, expressly or by implication, about removal of disabled children from neighborhood schools. In other words, while it clearly commands schools

---

12. While our research reveals that summary judgment is not frequently granted in IDEA cases, there is no prohibition against it. "Nothing in the language or legislative history of the [IDEA] suggests that Congress intended to dispense with the 'wholesome utility' of summary judgment." *Victoria L. v. District Sch. Bd.,* 741 F.2d 369, 372 (11th Cir.1984); *see also Ojai Unified Sch. Dist.,* 4 F.3d at 1472 n. 6 (stating the court did not suggest "that summary judgment could never be used in IDEA cases").

to include or mainstream disabled children as much as possible, it says nothing about where, within a school district, that inclusion shall take place.

■ The Murrays next argue that two implementing regulations make express what the statute merely implies. 34 C.F.R. § 300.552(a)(3) provides that "[t]he educational placement of each child with a disability [shall be] as close as possible to the child's home." 34 C.F.R. § 300.552(c) provides that state agencies must ensure that "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." The Murrays assert that these two regulations create a presumption that the LRE is in the neighborhood school.

We disagree. A natural and logical reading of these two regulations is that a disabled child should be educated in the school he or she would attend if not disabled (i.e., the neighborhood school), *unless* the child's IEP requires placement elsewhere. If the IEP requires placement elsewhere, then, in deciding where the appropriate placement is, geographical proximity to home is relevant, and the child should be placed as close to home as possible. *See Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 153 (4th Cir.) (the regulations "require[ ] only that a school board take into account, as one factor, the geographical proximity of the placement in making these decisions"), *cert. denied,* 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); *Devries v. Fairfax County Sch. Bd.,* 882 F.2d 876 (4th Cir.1989) (approving placement away from neighborhood school); *Urban v. Jefferson County Sch. Dist. R–1,* 870 F.Supp. 1558, 1568 (D.Colo.1994) ("[T]he statutory preference for placement at a neighborhood school is only that—and it does not amount to a mandate."). There is at most a preference for education in the neighborhood school. To the extent the Third Circuit has expressly held in *Oberti* that the IDEA encompasses a presumption of neighborhood schooling, we disagree. *See Oberti,* 995 F.2d at 1224 n. 31.[13]

The Murrays next argue that the voluminous legislative history surrounding the enactment of the statute, as well as the legislative history surrounding a subsequent proposal to amend certain implementing regulations and a resulting amendment to the IDEA, support their interpretation of the statute. We disagree.

With respect to legislative statements surrounding the enactment of the IDEA, they all present the same problem for the Murrays as the statute: they simply do not clearly indicate that Congress, in discussing mainstreaming or inclusion and the concept of the LRE for each disabled child, meant anything more than avoiding as much as possible the segregation of disabled children from nondisabled children. They in no way express a presumption that the LRE is always or even usually in the neighborhood school.

The Murrays fare little better with the legislative history surrounding the proposed amendment to certain implementing regulations in 1982 and 1983. In 1982 the Secretary of Education proposed amending some regulations, including 34 C.F.R. § 300.552(a)(3) requiring education as close as possible to a child's home. The regulations were ultimately not amended, but the IDEA was itself amended to include a prohibition against "any regulation ... which would procedurally or substantively lessen the protections provided to children ... as embodied in regulations in effect on July 20, 1983 (particularly as such protections relate to ... least restrictive environment)." 20 U.S.C. § 1407(b). The Murrays cite various statements made in connection with the proposed amendments, as well as the fact of section 1407(b)'s enactment, to support their argument that the LRE concept includes a strong presumption in favor of neighborhood

---

**13.** Even *Oberti* appears to qualify the presumption: "There is thus a presumption in favor of placing the child, *if possible,* in the neighborhood school, and if that is not feasible, as close as home as possible." *Oberti,* 995 F.2d at 1224 n. 31 (emphasis added). Further, as the District argues, *Oberti* was an inclusion case, involving a dispute over removing a disabled child from a regular classroom with nondisabled children to a self-contained classroom for children with disabilities. Removal from the neighborhood school, as a part of the removal from a regular to a special education classroom, was a secondary issue.

schools. We again reject this argument as simply insufficiently persuasive to overcome the plain meaning of the statute, and the absence therein of any reference to neighborhood schools. Accordingly, we hold that there is no presumption of neighborhood schooling, either in the IDEA or its implementing regulations.

■ The Murrays ask us to select an LRE standard from those proposed thus far by other circuit courts. We need not adopt an LRE compliance standard in order to decide this case, and we therefore choose not to do so. This is so because we have held that the LRE mandate does not include a presumption of neighborhood schooling, and a school district accordingly is not obligated to fully explore supplementary aids and services before removing a child from a neighborhood school. It is only so obligated before removing a child from a regular classroom with nondisabled children. The Murrays have never objected to the degree to which Tyler was educated outside the regular classroom; they only challenge his removal from his neighborhood school. We therefore need not decide which standard this circuit would apply to determinations of whether the LRE requirement of section 1412(5)(B) has been met.

## B. *DID THE DISTRICT COURT ERR IN NOT TAKING ADDITIONAL EVIDENCE?*

The Murrays argue the district court erred in failing to hear additional evidence as to (1) possible supplementary aids and services which could be implemented at Olathe and (2) Tyler's educational progress since the due process hearing.

### 1. *Evidence of Supplementary Aids and Services*

We have held, as a matter of law, that the obligation to explore supplementary aids and services prior to removing a child from a regular classroom does not apply independently to decisions to place children in non-neighborhood schools. The Murrays do not challenge Tyler's IEP insofar as it determined how much time Tyler should spend in a regular classroom, as compared with special education or resource classrooms. We therefore need not consider whether there are additional supplementary aids and services which could be implemented to comply with section 1412(5)(B)'s LRE mandate, and a remand for additional evidence on this point is unnecessary.[14]

### 2. *Tyler's Educational Progress Since the Due Process Hearing*

■ The Murrays also argue that the district court should have heard additional evidence of Tyler's educational progress since the due process hearing before ruling on the parties' motions for summary judgment.

There is a division between the circuits on the meaning and scope of section 1415(e)(2)'s directive that a district court in an IDEA case "shall hear additional evidence at the

---

**14.** There is an additional reason why we would not reach the issue of supplementary aids and services, and why a remand for the receipt of additional evidence on it would be unnecessary. The Murrays failed to exhaust this issue, as they must normally do before they can seek judicial review under the IDEA. *See Association for Community Living*, 992 F.2d at 1043.

Before the IHO and the ALJ, the Murrays consistently argued that they believed Tyler was making adequate educational progress at Olathe and that Olathe was a more appropriate and beneficial placement for him socially. They did not argue that the District had failed to include him in a regular classroom as much as possible, nor did they specifically argue that there were supplemental aids and services which the District should have explored before recommending placement at Northside. Even if the District bore the burden of proving that Olathe had become inappropriate for Tyler and that a change

to Northside was therefore necessary (an issue which we need not decide given our disposition of this case), the Murrays still had an obligation to raise any issue they believed was relevant to the determination of Tyler's appropriate placement and to make all arguments concerning the interpretation and application of the IDEA to their child. Allocation of burdens of production and persuasion does not relieve parties of their obligation to raise and articulate issues they wish to pursue later.

Further, in failing to argue this issue before the administrative tribunals, the Murrays "deprived this Court of the factual record necessary to review the alleged violations." *Garro v. Connecticut*, 23 F.3d 734, 738 (2nd Cir.1994). Moreover, the issue of what kinds of supplementary aids and services would be feasible and helpful to Tyler is precisely the kind of technical issue on which expert administrative tribunals should rule first.

request of a party."[15] Even under the more restrictive interpretation taken of "additional evidence" by the First and Ninth Circuits, arguably evidence relating to a child's educational progress subsequent to the due process hearing would be relevant to a determination of appropriate placement pursuant to an IEP. It would be "evidence concerning relevant events occurring subsequent to the administrative hearing." *Town of Burlington*, 736 F.2d at 790. Other courts have admitted such evidence. *See, e.g., Lenn*, 998 F.2d at 1088; *Greer*, 950 F.2d at 698; *Mavis*, 839 F.Supp. at 980.

However, we need not remand this case for such "additional evidence" because we agree with the District's contention that any necessity for doing so has been rendered moot by the evaluation and review of Tyler's IEP conducted in November 1993, pursuant to which Tyler was placed at Olathe.[16]

## C. *OTHER FACTUAL DISPUTES*

Having determined that the district court made no legal error, and that it did not err in failing to take additional evidence, we are left with determining whether any genuine issues of material fact remained which precluded the grant of summary judgment on the record before the district court. The only disputed factual issue before the ALJ and the district court was whether Tyler was making educational progress at Olathe such that placement there was appropriate under the IDEA. That issue has been rendered moot by Tyler's subsequent evaluation and IEP

placing him at Olathe. It would serve no purpose to remand this case for further proceedings directed to resolving that issue, in light of his later evaluation and placement.

## D. *CROSS–APPEAL AND MOTION TO DISMISS*

The District's cross-appeal from the district court's earlier denial of its motion for summary judgment has likewise been mooted by our affirmance of the district court's grant of summary judgment to the District. Having ruled in their favor, there is no additional relief we could provide the District. We therefore grant the Murrays' motion to dismiss the cross-appeal.

## CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court granting the District's motion for summary judgment and dismissing the case.

---

**15.** The First and Ninth Circuits have construed "additional" to mean "supplemental." "The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 790 (1st Cir.1984), *aff'd on other grounds*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *see also Ojai Unified Sch. Dist.*, 4 F.3d at 1472–73.

The Sixth Circuit has subsequently expressly disagreed with the *Burlington* interpretation, "insofar as this language suggests that additional evidence is admissible only in limited circumstances, such as to supplement or fill in gaps in the evidence previously introduced...." *Metropolitan Gov't v. Cook*, 915 F.2d 232, 234 (6th Cir.1990). The *Cook* court held that "'[a]ddi-

tional' in its ordinary usage, implies something that is added, or something that exists by way of addition. To 'add' means to join or unite; the limitation on what can be joined inherent in the term 'supplement' is not present in the term 'add.'" *Id.; see also Mavis v. Sobol*, 839 F.Supp. 968, 979 (N.D.N.Y.1993) (discussing First and Sixth Circuit positions).

**16.** While mootness is often raised in IDEA cases, and there has been a suggestion of it in this case, it is clear that the legal issue on which we have ruled in this decision has not been rendered moot by Tyler's placement at Olathe. Questions as to the appropriate interpretation of the LRE mandate of section 1412(5)(B) are obviously capable of repetition. *See Honig v. Doe*, 484 U.S. 305, 318, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988); *Rachel H.*, 14 F.3d at 1403; *Daniel R.R.*, 874 F.2d at 1040.