**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BOB AND KAREN ELLENBERG, as
parents and next friends of S.E., a
minor,

     Plaintiffs-Appellants,

v.

NEW MEXICO MILITARY
INSTITUTE; BOARD OF REGENTS
OF THE NEW MEXICO MILITARY
INSTITUTE,

     Defendants-Appellees.

No. 05-2056

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CV-04-00347 PK/DJS)**

---

Gail Stewart (Laurel Nesbitt with her on the briefs), Steven Granberg, P.A.,
Albuquerque, New Mexico, for Plaintiffs-Appellants.

John F. Kennedy (Samantha J. Fenrow with him on the briefs), Cuddy, Kennedy,
Albetta, & Ives, LLP, Santa Fe, New Mexico, for Defendants-Appellees.

---

Before **LUCERO**, **SILER**,[*] and **O'BRIEN**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Bob and Karen Ellenberg, the parents of a disabled child residing in New Mexico, appeal the district court's grant of summary judgment in favor of the New Mexico Military Institute at Roswell and its Board of Regents (collectively referred to as "NMMI") on their claims under the Individuals with Disabilities Education Act ("IDEA"), the Americans with Disabilities Act ("ADA"), and § 504 of the Rehabilitation Act ("RA"). They argued that NMMI's denial of their child's application for admission violated all three statutes, and sought a declaration from the district court that NMMI is bound by the IDEA.

The IDEA requires states that accept federal special education funds to provide disabled children with a "free appropriate public education" ("FAPE") in the "least restrictive environment" ("LRE"). It guarantees that such an education is given by instructing states to create an Individualized Education Plan ("IEP") for each child within its care. As part of the bargain, however, Congress requires parents to exhaust IDEA's administrative procedures and remedies before filing suit in federal court. The district court questioned whether the Ellenbergs

---

[*] The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

- 2 -

satisfied this mandate, but nonetheless addressed the merits of the IDEA claim. It was error to do so.

We hold today that before a party may seek relief in federal court alleging a violation of the IDEA's substantive provisions, a party must first request an IEP for the disabled child, or seek a change to a current IEP if one exists, from the agency designated to create that plan under the state's educational framework. Because it is undisputed that plaintiffs never attempted to amend their child's existing IEP or obtain a new IEP before pursuing the IDEA claim, they have failed to exhaust the IDEA's administrative procedures and remedies.

Under our precedent, parties are precluded from bringing claims under the ADA and the RA that are educational in nature if they have failed to exhaust IDEA's administrative procedures, and relief for their injuries is available under the IDEA. Although we hold that plaintiffs have failed to exhaust IDEA's administrative procedures, they are unable to obtain relief under the IDEA for their pure discrimination claims brought pursuant to the RA and ADA, and thus are not barred from bringing these claims in federal court at this time. The district court's sole basis for granting summary judgment to NMMI on these claims was that plaintiffs' IDEA claim failed. Because plaintiffs' claims under the RA and ADA are separate and distinct from the IDEA claim, the district court's ruling in favor of NMMI on this basis was in error.

Accordingly, we exercise jurisdiction pursuant to 28 U.S.C. § 1291, **REVERSE** the district court's grant of summary judgment in favor of NMMI on the IDEA claim, and **REMAND** with instructions to dismiss that claim for lack of jurisdiction. We **REVERSE** the district court's grant of summary judgment in favor of NMMI on the Ellenbergs' claims under Title II of the ADA and § 504 of the RA, and **REMAND** for reconsideration of the motion for summary judgment on the ADA and RA claims.

## I

Before addressing the Ellenbergs' claims, we consider the education law framework under which they seek to be brought. When analyzed in concert, the IDEA, New Mexico's education laws, and NMMI's unique status provide a complex legal backdrop with numerous interconnections, cross-definitions, and a few seeming contradictions.

## A

Congress passed the IDEA,[1] a federal spending statute, in response to concerns about the educational opportunities afforded disabled students. Considered an "ambitious federal effort to promote the education of handicapped

---

[1] Formerly titled the Education of the Handicapped Act, the name of the Act was officially changed to the IDEA in 1990. See Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101-476, 104 Stat. 1141. For clarity's sake, we have changed all references to the EHA in prior opinions and legislative materials to the IDEA. All statutory citations refer to the 2000 edition of the United States Code, which was in effect during the relevant period.

children," the IDEA "provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with [its] extensive goals and procedures." See Bd. of Educ. v. Rowley, 458 U.S. 176, 179 (1982).

At base, it "ensure[s] that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d). To this end, in order to receive federal funding the state must create an individualized education plan for each disabled child. 20 U.S.C. § 1412(a)(4); See O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233, 144 F.3d 692, 698 (10th Cir. 1998).

> Prepared at meetings between a representative of the local school district, the child's teacher, the parents or guardians, and, whenever appropriate, the disabled child, the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.

Honig v. Doe, 484 U.S. 305, 311 (1988) (internal citations omitted); see 20 U.S.C. § 1414(d). Review of IEPs must occur at least annually, and are to be revised as appropriate. Id.

By passing the IDEA, Congress also sought to "mainstream" disabled children, i.e., states must have a goal of providing "full educational opportunity to

all children with disabilities and a detailed timetable for accomplishing that goal." § 1412(a)(2). Each child has a substantive right to receive his or her education in the "least restrictive environment." See § 1412(a)(5)(A). That is, students must be educated "[t]o the maximum extent appropriate . . . with children who are not disabled" in a "regular educational environment." Id. States are prohibited from segregating or otherwise removing disabled children from the regular classroom setting except "when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Id.; see Honig, 484 U.S. at 311.

In conjunction with this right, "[e]ach public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.115(a). Placement decisions must be based on the child's IEP, and made by "a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." § 300.116(a)(1). Unless a child's IEP requires some other arrangement, the child should be "educated in the school that he or she would attend if nondisabled." Id.

The IDEA also sought to maximize parental involvement in educational decisions affecting their disabled child by granting parents a number of procedural rights. For example, parents are entitled to: (1) examine all records relating to their child, 20 U.S.C. § 1415(b)(1); (2) participate in the IEP

preparation process, id.; (3) obtain an independent evaluation of their child, id.; (4) receive notice before an amendment to an IEP is either proposed or refused, § 1415(b)(3); (5) take membership in any group that makes decisions about the educational placement of their child, § 1414(f); and (6) receive formal notice of their rights under the IDEA, § 1415(d)(1).

Responsibility for implementing the IDEA and policing IDEA compliance rests with the states, subject to the IDEA's limited but specific structural framework. Schaffer ex rel. Schaffer v. Weast, 126 S. Ct. 528, 531 (2005) (citing Rowley, 458 U.S. at 183). Each "State Educational Agency" ("SEA") must enact procedures and policies to implement the IDEA, and ensure both state and local compliance with the Act. 20 U.S.C § 1412(a)(11). "Local Education Agencies"[2] ("LEAs") are given primary responsibility for overseeing the actual provision of special education services to disabled children. See § 1413(a)(1); Gadsby v. Grasmick, 109 F.3d 940, 942-43 (4th Cir. 1997). SEAs ensure LEA compliance

---

[2] An LEA is

> a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools.

20 U.S.C. § 1401(15)(A).

through the power of the purse: Federal IDEA funds are distributed to the SEA, and those funds may not be forwarded to LEAs within the state unless they demonstrate compliance with the IDEA to the satisfaction of the SEA. § 1413(a), (d). In addition, the IDEA places an obligation to provide special education services on "public agencies" that are "responsible for providing education to children with disabilities," 34 C.F.R. § 300.53, as well as on "education services agencies" that have "administrative control and direction" over a public secondary school, § 300.12.

Should an LEA or state agency prove "unable to establish and maintain programs of free appropriate public education in compliance with IDEA," the SEA must provide special education and related services directly to disabled children. 20 U.S.C. § 1413(h)(1). In so doing, the SEA "may provide special education and related services . . . in such a manner and at such locations (including regional or state centers) as the State agency considers appropriate." § 1413(h)(2). However, the SEA is required to comply with IDEA requirements as if it were an LEA. 34 C.F.R. § 300.175.

When parents believe their child is not being provided a FAPE in the least restrictive environment, they are entitled to an impartial due process hearing, conducted by either the SEA or the LEA as determined by state law. 20 U.S.C. § 1415(f). If the hearing is held before an LEA, the losing party may appeal to the SEA. § 1415(g). Once state administrative procedures and remedies are

exhausted, any party "aggrieved" by the hearing officer's decision has a right to file a civil action in state or federal court. § 1415(i)(2).

**B**

New Mexico's constitution gives each child the right to a free public education. N.M. Const. art. XII, § 1; see also N.M. Stat. § 22-1-4.[3] The New Mexico legislature has defined this right as an entitlement to attend a public school within the school district[4] in which the student resides. N.M. Stat. § 22-12-4. Students may also attend other public schools within the state subject to availability, as determined by "enrollment preferences." Id.

The New Mexico Public Education Department ("NMPED") (formerly the "State Board of Education") controls, manages, and directs all public schools in the state, and is authorized to promulgate and enforce regulations towards these ends. N.M. Const. art. XII, § 6; N.M. Stat. § 22-2-1. NMPED is the "sole educational agency of the state for the administration or for the supervision of the administration of any state plan established or funds received by the state by virtue of any federal statute relating to aid for education" for the state's general public school system. N.M. Stat. § 22-9-2. At the local level, each school district

---

[3] All references to New Mexico statutes refer to those in effect at the times relevant to this action, unless otherwise specified.

[4] A "school district" is defined as "an area of land established as a political subdivision of the state for the administration of public schools and segregated geographically for taxation and bonding purposes." N.M. Stat. §§ 22-3-54.1, 22-4-1.

is governed by a local school board, which is authorized to establish rules governing enrollment in the district's public schools and develop the district's educational policies.  N.M. Stat. §§ 22-1-4(e), 22-5-4.

New Mexico has long provided special education services to its residents. Although NMPED is required to promulgate rules and standards governing the provision of special education services, local school districts are responsible for directly providing special education and related services to disabled students. N.M. Stat. § 22-13-5.  New Mexico has chosen to accept IDEA funds, and has adopted rules to comply with IDEA's requirements accordingly.  For purposes of the IDEA, New Mexico's SEA is the NMPED, and its LEAs are generally the local school districts.

NMPED's regulations largely track the federal act, and are "binding on each New Mexico public agency that has direct or delegated authority to provide special education and related services, regardless of whether that agency is receiving funds under the Individuals with Disabilities Education Act."  N.M. Code R. § 6.31.2.2.  LEAs are tasked with developing IEPs for children within their educational jurisdiction.  § 6.31.2.11(A)(3)(g).  Should the LEA ultimately determine that the general public school system is unable to meet the needs of a

disabled student, it may request that the student be placed in a state-supported educational agency,[5] § 6.31.2.11(J)(1)(c), or in a "private school or facility." § 6.31.2.11(L)(1).  Neither type of institution is required to admit such student upon referral; rather, it may "consider the child for possible enrollment." § 6.31.2.11(J)(1)(C).  If a child is accepted, the accepting institution assumes primary responsibility for providing the child with a FAPE.  § 6.31.2.11(J)(2).

## C

NMMI is a state educational institution that offers a college preparatory education in a military-style setting to students nationwide, although a preference is given to New Mexicans.  N.M. Const. art. XII, § 11; N.M. Stat. §§ 21-12, 22-1-2(V).  The parties agree that NMMI is a unique educational institution – it is the only publicly-funded, boarding military high school in New Mexico, and appears to be the only one of its kind in the nation.  NMMI is unique in other ways as well.  Although it receives substantial state funding, New Mexico does not

---

[5] A "state-supported educational agency" is a publicly funded program that

(a) provides special education and related services to children with disabilities who come within the program's educational jurisdiction; (b) is operated by, or under contractual arrangements for, a state school, state educational institution or other state institution, state hospital or state agency; and (c) is primarily funded through direct legislative appropriations or other direct state support to a public agency other than a local school district.

N.M. Code R. § 6.31.2.7(C)(18).

consider NMMI to be a part of the uniform system of free public schools mandated by the New Mexico Constitution. It is also specifically exempted from NMPED's general oversight and control. § 22-2-2(J). Instead, it is governed by a Board of Regents charged to "maintain and control, at Roswell, a military institute for the education and training of the youth in this country, of as high a standard as like institutions in other states and territories," and promulgate rules and regulations accordingly. § 21-12-3, -4. The Board fixes both NMMI's tuition rate – NMMI must charge tuition under state law – and its admissions standards. § 21-12-1, -2, -4, -7.

NMMI's admissions standards are rather precise: Applicants must have a minimum 2.5 grade point average, satisfactorily complete the on-campus admissions test, be in good physical condition, show respect for others, be able to participate in athletic and leadership development activities, and have no major disciplinary, drug, or alcohol problems. There are also a number of specified disqualifying attributes identified in NMMI's 2002-2003 admissions catalog, including:

> regularly scheduled psychological counseling or any other severe psychological disorders or limiting condition[s] which in the opinion of the medical staff would interfere with the cadet's ability to function satisfactorily at [NMMI], [or a] demonstrated [] inability to meet the existing NMMI academic requirements without significant accommodations that would alter the academic mission of [NMMI].

NMMI is not a New Mexico school district that is required to provide special education services under New Mexico law. See N.M. Stat. § 22-1-2(R). Throughout this litigation, NMMI has taken the position that it is also not bound by the IDEA. Nonetheless, NMMI contends it has admitted disabled applicants as long as they are "otherwise qualified," but will not alter its programs to accomodate those with special needs.[6]

**D**

S.E. is the child of Bob and Karen Ellenberg. In late 2000 S.E. moved to Los Alamos, New Mexico to live with her father, after exhibiting significant behavioral problems while living with her mother in Florida. Unfortunately, S.E.'s problems worsened in New Mexico, where she engaged in high-risk activities, including the abuse of various illegal drugs. When plaintiffs enrolled S.E. at Los Alamos High School ("LAHS"), the public high school serving her school district, they informed school officials about her problems and requested that S.E. be closely monitored. The Ellenbergs did not, however, request that LAHS provide S.E. with special education services.[7] Soon after she started attending LAHS, S.E. stole her parents' car and credit card, prompting the exasperated Ellenbergs to press charges against her. During subsequent court

---

[6] NMMI expressly informs potential applicants that its admission standards "may exclude students with specific disabilities."

[7] Her father testified that he did not know he should request such services.

proceedings related to that incident, S.E. received a "Waiver of Time Limitation,"

under which all charges would be dismissed if she satisfied certain conditions.

One of those conditions was placement in a court-ordered residential

treatment program. S.E. was assigned to Casa de Corazon ("CdC"), a treatment

facility located in Taos, New Mexico. In November 2002, the Taos Municipal

School District evaluated S.E. and concluded she qualified for special education

services on the basis of an emotional disability.[8] It accordingly prepared an IEP

for her, which recommended both a course of study – S.E. was to receive high

school curriculum – and a behavioral intervention plan. LAHS was identified in

the IEP as S.E.'s public high school based on her residency, but because of her

behavioral and social problems the IEP recommended residential treatment

elsewhere. Specifically, the IEP team determined that S.E. needed a "small,

structured learning environment" and "careful monitoring." CdC, with a

professional staff trained to address her unique needs, was thus identified as her

LRE. The IEP was to be reviewed one year from the date it was created or at the

time of her discharge, whichever occurred first.

S.E. (then fifteen) anticipated being discharged from CdC during the

summer following the 2002-2003 school year. Rather than requesting an IEP for

the upcoming school year from either the Los Alamos School District or the Taos

---

[8] S.E. was diagnosed with Oppositional Defiance Disorder ("ODD"), a disorder recognized by the American Psychiatric Association.

Municipal School District, her undisputed LEAs for IDEA purposes, the Ellenbergs allowed S.E. to apply directly to NMMI for the fall 2003 semester. In her application packet, the Ellenbergs disclosed that S.E. had previously exhibited "a lot of disciplinary problems," was currently enrolled in a residential treatment program in Taos, was diagnosed with ODD, and was taking medication to control her behavioral problems. They noted, however, that S.E. was now determined to change her ways and showed signs of progress on that front. S.E. also included a personal letter outlining her reasons for seeking admission: She "want[s] a good education, and want[s] to be in the military."

In June 2003 NMMI notified the Ellenbergs that S.E. would not be admitted for the fall semester, but would be considered for the winter semester if she demonstrated an ability to succeed in a regular classroom setting. Dissatisfied with that decision, plaintiffs submitted personal letters and testimonials from two of S.E.'s treating therapists at CdC. Although the therapists corroborated plaintiffs' belief that S.E. showed signs of improvement, they noted that S.E.'s difficulties with anger and authority persisted. One therapist recommended that S.E. start at NMMI in August, opining that S.E.'s continued need for a "structured learning environment" would be satisfied at NMMI.[9]

_____

[9] At the same time CdC personnel recommended S.E. for admission to NMMI, they prepared a treatment plan for S.E. noting her continuing authority problems, inability to control her temper and impulses, touchy demeanor, difficulty limiting her "cussing," and difficulty in getting along with her peer

(continued...)

- 15 -

Despite these efforts, NMMI upheld its decision based on (1) S.E.'s presence in CdC, (2) her admitted past drug use, (3) her present medication requirements, and (4) her need for continued counseling. Again, NMMI suggested that S.E. reapply for the winter semester after demonstrating the ability to succeed in "an educational environment other than a Residential Treatment Facility." The Ellenbergs opted to pursue an alternate approach.

Days later, they filed a request with NMPED for an IDEA administrative due process hearing against NMMI. Plaintiffs argued NMMI's refusal to provide S.E. with a FAPE violated her rights under the IDEA and § 504 of the RA. When NMPED assigned a hearing officer to address the claim, NMMI entered a limited appearance solely for the purpose of contesting jurisdiction. NMMI posited that because it is not a "public school or agency" it is not bound by the provisions of the IDEA or § 504 of the RA. The hearing officer found against NMMI on the jurisdictional question, but ultimately ruled in favor of NMMI on the merits. She concluded that NMMI was not required to provide S.E. with a FAPE under the IDEA or the RA because plaintiffs failed to show S.E. was otherwise qualified to attend NMMI. Both parties filed administrative appeals: NMMI contested the jurisdictional finding; plaintiffs challenged the ruling that S.E. was not otherwise

[9](...continued)
group. In that plan, they also concluded that she remained depressed, refused to take responsibility for her actions on certain occasions, and continued to have anger outbursts, albeit less frequently and for shorter periods of time.

qualified. Concluding that the hearing officer wrongly decided that NMMI was a "public school or agency" bound by the IDEA and the RA, the administrative appeals officer dismissed plaintiffs' claims for lack of subject matter jurisdiction or, in the alternative, failure to state a claim upon which relief could be granted. Their IDEA claim, the appeals officer noted, "borders on being wholly insubstantial and frivolous."

The Ellenbergs then filed a civil action in federal court against NMMI asserting claims under the IDEA, § 504 of the RA, and Title II of the ADA. Although it recognized "exhaustion concerns" due to plaintiffs' failure to obtain an IEP from an LEA before filing suit, the district court proceeded to address the merits. It first rejected the IDEA claim, interpreting plaintiffs' argument under the IDEA as follows: The IDEA provides students with the right to choose where they will receive a FAPE, i.e., which school is the student's least restrictive environment, and thus S.E. has a right to choose to receive a FAPE from NMMI. In its order, the court found that nothing within the IDEA's provisions cited by plaintiffs "support[s] the theory that special education is merely a service that must be provided wherever the student chooses to attend school." See Ellenberg v. N. M. Military Inst., No. CV-04-00347 PK/DJS, slip. op. at 28 (D.N.M. February 7, 2005). Its findings expressly noted, however, that the court was not addressing whether "NMMI must provide a FAPE for a child with a disability admitted to NMMI." Relying on this circuit's decision in Urban ex rel. Urban v.

Jefferson County Sch. Dist. R-1, 89 F.3d 720 (10th Cir. 1996), the court also granted summary judgment to NMMI on the ADA and the RA claims, finding that if the state satisfied its obligations under the IDEA it was not required to do more under the ADA or the RA.

**II**

We review the district court's grant of summary judgment de novo, applying the same standard employed by the district court. See L.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 974 (10th Cir. 2004). That standard was described in detail in Nebo Sch. Dist.:

> The IDEA sets up a unique standard for a federal court's review of the administrative due process hearing. A district court applies a modified *de novo* standard in reviewing a hearing officer's decision under the IDEA. It looks at the record of the administrative proceedings and decides, based on a preponderance of the evidence, whether the requirements of the IDEA are met. In so doing, it must give "due weight" to the hearing officer's findings of fact, which are considered *prima facie* correct. Although the district court may accept additional evidence, such evidence is merely supplemental to the administrative record. . . .
>     . . . .
>     . . . Because the IDEA requires a district court to grant a judgment on the record based on its own ascertainment of the preponderance of the evidence, many IDEA claims do not fit into the typical summary judgment standard of "no genuine issues of material fact."

Id. at 973-74 (internal citations omitted). Any legal determinations made by the district court interpreting the IDEA are reviewed de novo. Id.

- 18 -

As an initial matter, it is important to understand what the Ellenbergs are not arguing. They do not claim that either the Los Alamos or Taos Municipal School Districts – S.E.'s LEAs – were unable to provide her with a FAPE. Compare O'Toole ex rel. O'Toole, 144 F.3d at 695. Nor do they claim that S.E. was denied a FAPE or appropriate reimbursement following her admission to NMMI, compare Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993), because S.E. was never admitted to NMMI. Notably, this is not a suit brought against the State of New Mexico, the Governor, or the head of NMPED, arguing that NMMI's failure to offer special education services (1) violates New Mexico's obligation under the IDEA to have a goal of full educational equality, or (2) categorically denies S.E. a FAPE in the least restrictive environment by limiting the continuum of placements her LEAs may consider. Compare Ass'n for Cmty. Living in Colo. v. Romer, 992 F.2d 1040 (10th Cir. 1993); Eva N. v. Brock, 943 F.2d 51 (6th Cir. 1991); N.M. Ass'n for Retarded Citizens v. New Mexico, 678 F.2d 847 (10th Cir. 1982) (challenging New Mexico's state education system based on § 504 of the RA); Bitsilly v. Bureau of Indian Affairs, 253 F. Supp. 2d 1257, 1259-60 (D.N.M. 2003).

Instead, plaintiffs argue: (1) NMMI's failure to offer education services to disabled children, including S.E., caused its denial of her application; and (2) NMMI was required to provide S.E. with a FAPE because she is entitled to an education in the least restrictive environment, which is NMMI.

The Ellenbergs misunderstand the IDEA.  In their brief, which relies heavily on anti-discrimination hyperbole, they view the IDEA as a virtual treasure trove providing disabled children with a limitless number of substantive rights.  The IDEA, however, is not so broad.  It is a spending statute that imposes obligations on the states to provide certain benefits in exchange for federal funds.  See Rowley, 458 U.S. at 204 n.26.  Although "Congress has broad power to set the terms on which it disburses federal money to the States, . . . when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'"  Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 126 S.Ct. 2455, 2459 (2006) (internal citation omitted).  Courts engage in a two-step inquiry to determine if a state has satisfied its substantive IDEA obligations.  "First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  Rowley, 458 U.S. at 206-07.  If the answer to both is yes, "the State has complied with the obligations imposed by Congress and the courts can require no more."  Id. at 207.

Citing the IDEA's 30-year old requirement that states "establish[] a goal of providing full educational opportunity to all children with disabilities," see 20 U.S.C. § 1412(a)(2), plaintiffs  argue that the IDEA requires absolute educational equality.  In support, they point to language contained in Congress' recent

reauthorization of the IDEA, specifically Congress' finding that it is in the "national interest that the Federal Government have a supporting role in assisting State and local efforts to educate children with disabilities in order to improve results for such children and to ensure equal protection of the law." 20 U.S.C. § 1400(c)(6) (2005). Plaintiffs, however, have not presented us with a single case from any court recognizing a legally cognizable anti-discrimination claim brought under the IDEA.[10] Moreover, the Supreme Court has explicitly rejected a similar attempt to transform the IDEA into an anti-discrimination vehicle in a 30-year old case, the very case cited by plaintiffs in support of their view. See Rowley, 458 U.S. at 198 (noting that in passing the IDEA Congress did not intend "to achieve strict equality of opportunity or services" and further holding "the requirement that a state provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential 'commensurate with the opportunity provided other children.'"); see also Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 623 n.6 (1999) (Thomas, J., dissenting) (noting that the IDEA is not a general anti-discrimination statute).

---

[10] The few cases cited by plaintiffs involve discrimination claims under the ADA, not the IDEA. See, e.g., Padilla ex rel. Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1271 (10th Cir. 2000) ("Plaintiff . . . alleged that the school district and the board of education violated her rights under the ADA by excluding her from participation in publicly funded general and special education programs based on her disability.").

In any event, both claims ultimately fail because the Ellenbergs did not exhaust the IDEA's administrative procedures before filing a lawsuit against NMMI.[11] "As part of the bargain of providing children with educational rights and parents with procedural safeguards to protect those rights, Congress required that parents turn first to the statute's administrative framework to resolve any conflicts they had with the school's educational services." Cudjoe ex rel. Cudjoe, 297 F.3d at 1064. We have interpreted the IDEA's exhaustion requirements broadly, noting Congress' clear intention to allow those with experience in educating the nation's disabled children "at least the first crack at formulating a plan to overcome the consequences of educational shortfalls." Id. at 1065; see also Hayes ex rel. Hayes v. Unified Sch. Dist. No. 377, 877 F.2d 809, 814 (10th Cir. 1989) (noting the "philosophy of the [IDEA] is that plaintiffs are required to utilize the elaborate administrative scheme established by the Act before resorting to the courts to challenge the actions of the local school authorities"). In addition, we have recognized the important purposes served by exhaustion, including: (1) "[A]llowing the full development of technical issues and a factual record prior to court review;" (2) "[P]reventing deliberate disregard and circumvention of agency procedures established by Congress;" and (3)

---

[11] This issue was not resolved by the district court. As always, however, we have an independent obligation to satisfy ourselves of jurisdiction over this matter before addressing the merits of the claim. See Cudjoe ex rel. Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1063 (10th Cir. 2002).

"[A]voiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error." Id. (citing Ass'n for Retarded Citizens, Inc. v. Teague, 830 F.2d 158, 160 (11th Cir. 1987)).

Although they advanced through the state administrative process, plaintiffs ignored two of the IDEA's most basic initial steps. First, they did not obtain an IEP from either of S.E.'s undisputed LEAs for the 2003-2004 school year. Compare Nebo Sch. Dist., 379 F.3d at 970-71. Instead, the Ellenbergs unilaterally determined that NMMI was their child's LRE. Second, they did not request a change to S.E.'s then current IEP as prepared by the Taos Municipal School District for the 2002-2003 academic year. At the time S.E. applied to NMMI, that IEP stated that because of her behavioral problems and special needs, CdC was her LRE. If plaintiffs believed S.E. required a new educational placement, the proper course would have been for them to request a change to her IEP. See 20 U.S.C. § 1414(d)(4). Following that request, should S.E.'s IEP team not select NMMI as her educational placement, plaintiffs would have had the right to challenge that decision via state administrative proceedings.

Failure to exhaust is excused if the relief plaintiffs seek is not "available" under the IDEA. See 20 U.S.C. § 1415(i)(2); Cudjoe ex rel. Cudjoe, 297 F.3d at 1065. Exhaustion is also not required if pursuing administrative remedies would be futile or if "an agency has adopted a policy or pursued a practice of generally

[sic] applicability that is contrary to the law." Urban ex rel. Urban, 89 F.3d at 724 (citing H.R. Rep. No. 99-296 (1985)).

Potentially, relief is available to the plaintiffs under the IDEA. Relief is available whenever the plaintiff could attain "relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers." Cudjoe ex rel. Cudjoe, 297 F.3d at 1066. The "dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies." Padilla ex rel. Padilla, 233 F.3d at 1274. We do not determine the availability of the relief based on the immediate ability of a plaintiff to attain it, recognizing that "a child may have to go through several procedural steps to take advantage of that remedy." Cudjoe ex rel. Cudjoe, 297 F.3d at 1066. If "the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required . . . . " Padilla ex rel. Padilla, 233 F.3d at 1274.

Although the Ellenbergs characterize the relief they seek as S.E.'s admission to NMMI, their only legally cognizable injury under the IDEA is the state's failure to provide their child with a FAPE in the least restrictive environment. They contend that their child's least restrictive environment is NMMI, as it is the only place where she can receive a military-style education. Because they have ignored the IDEA's procedural requirements, however, we have no way of deciding whether a military-style education is appropriate for

S.E.[12] Even assuming her LEA may determine that the only way to ensure S.E. receives a FAPE is to provide her with such education, they could possibly craft an IEP incorporating such a program at her local public school. Should her LEA determine that because of S.E.'s specific needs NMMI is her least restrictive environment, New Mexico law provides for a referral system whereby her LEA could refer her to NMMI.[13] NMMI, with an updated IEP and a better understanding of S.E.'s education needs, would then be able to make an informed decision on whether to admit S.E. based on the LEA's recommendation.

We disagree that requiring the Ellenbergs to request a new IEP from a child's LEA before filing a suit, on the ground that the child is not being given a FAPE in the least restrictive environment, would be futile and "without logic." The IEP is the "centerpiece of the [IDEA's] education delivery system." See Honig, 484 U.S. at 311. When a disabled child alleges that the state is failing to provide an education in the LRE, the need for an IEP is especially great. In determining whether an educational placement is a student's LRE, we look to (1)

---

[12] We do not address whether S.E. is entitled to a military-style education under the IDEA. However, it is well-established that the IDEA does not guarantee a particular type of substantive education. See Rowley, 458 U.S. at 207.

[13] In addition, under the IDEA an SEA is obligated to "mak[e] arrangements with public and private institutions (such as a memorandum of agreement or special implementation procedures)" to ensure that each child is given a FAPE in her least restrictive environment. 34 C.F.R. § 300.118.

"whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily;" and (2) "if not, if the school district has mainstreamed the child to the maximum extent appropriate." See Nebo Sch. Dist., 379 F.3d at 976 (citing Murray ex rel. Murray v. Montrose County Sch. Dist. RE-1J, 51 F.3d 921, 927 n.10 (10th Cir. 1995)).  Our review is necessarily fact-intensive, requiring careful analysis of the particular child's needs and abilities.  Without a recent IEP prepared at the time the placement at NMMI was requested, neither this court nor a district court has a factual record adequate to determine if NMMI is appropriate for S.E.  See Urban ex rel. Urban, 89 F.3d at 724.[14]

Nor are we persuaded that their claims fall within the general applicability exception simply because they purport to challenge NMMI's policies rather than a specific IEP prepared for S.E.  See Romer, 922 F.2d at 1044.  "Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." Ass'n for Cmty. Living in Colo., 992 F.2d at 1044.  However, in pursuing these claims plaintiffs must show that

_____

[14] Nebo Sch. Dist. does not require a different result.  In Nebo Sch. Dist., plaintiffs challenged the placement decision identified in the IEP on the grounds that the selected school, which had a high concentration of disabled students, was not the child's LRE.  See 379 F.3d at 968.  We agreed that, based on the child's IEP, the school district's proposed placement was not the child's least restrictive enviroment.  If anything, Nebo School Dist. highlights the importance of obtaining an IEP before initiating litigation over which school constitutes the LRE.

the policies are contrary to the law and that the underlying purposes of exhaustion would not be served by requiring procedural compliance. Id. Plaintiffs advance a plausible argument that NMMI's refusal to provide special education services to any student per se infringes upon a child's right to an education in the LRE. However, as noted above, without an IEP we do not know if NMMI was S.E.'s least restrictive environment and thus cannot determine whether her rights under the IDEA were violated.[15] Requiring plaintiffs to first pursue administrative procedures and remedies is fully consistent with purposes of exhaustion. See id.

Plaintiffs make an ambiguous assertion that "exhausting administrative remedies against Los Alamos was inconsistent with enforcement of their legal right to seek admission to NMMI, attend NMMI if admitted, and receive such special education services as a NMMI student." Nothing precluded S.E. from applying to NMMI; she applied in May 2003. Because she was not admitted to NMMI, she was not prohibited from attending NMMI following admission or denied a FAPE once accepted there.

Lastly, we reject plaintiffs' claim that requiring S.E. to obtain an IEP before filing suit is inconsistent with her right to attend NMMI if she is "otherwise qualified." S.E. is not entitled to specify which public agency (or

---

[15] Unlike the plaintiffs in Romer and N.M. Ass'n for Retarded Citizens, plaintiffs are not pursuing a class action on behalf of all similarly situated children. Instead, they bring a claim on behalf of S.E. arguing that her individual substantive right to an education in the LRE has been violated.

school for that matter) must provide her FAPE or prepare her IEP. Plaintiffs view the IDEA's substantive guarantee of an education in the LRE as a chit, to be cashed in at whatever school she wishes to attend. Once again, this misconstrues the rights of a disabled student under the IDEA, and once again, plaintiffs articulate a position for which they cite no relevant legal authority.

It is to the states, not students, that Congress delegated authority to implement the IDEA. See Rowley, 458 U.S. at 207-08. IDEA's requirements that students receive an education in the LRE do not preclude a state from initially assigning students to local school districts and requiring them to seek an IEP from that school district.[16] Although parents are given a right to participate in the placement decision, states retain "[t]he primary responsibility for formulating the education to be accorded a handicapped child," including the proper educational placement. Rowley, 458 U.S. at 208. Parents may challenge a

_____

[16] Plaintiffs appear to argue that because S.E. is within NMMI's "educational jurisdiction," NMMI must prepare her IEP. Under New Mexico law, each "public agency" must adopt rules to ensure that all children within its educational jurisdiction are given a FAPE. N.M. Code R. § 6.31.2.9(A). They interpret this provision as follows: Because all New Mexico students are entitled to apply to NMMI, all New Mexico students are in its "educational jurisdiction," and thus NMMI is required to create a FAPE for every New Mexico student that requests it prepare one. New Mexico's specified structure for IEP preparation places that burden on LEAs, and NMMI is unquestionably not an LEA under New Mexico law. If an LEA determines the student requires the services of a state-educational agency, which arguably includes NMMI, it may "refer" the student to that agency. N.M. Code R.. § 6.31.2.11(J)(1)(c). Even in that context, the agency is not required to immediately accept the student. Plaintiffs' interpretation of New Mexico law is plainly without merit.

state's proposed IEP, but courts must defer to the state's proposal if that plan is reasonably calculated to provide the child with a FAPE in the least restrictive environment, even if a parent believes a different placement would maximize a child's educational potential.  See Urban ex rel. Urban, 89 F.3d at 727; Lachman v. Ill. State Bd. of Educ., 852 F.2d 290, 297 (7th Cir. 1998) (rejecting students' claim that they have a right to choose where they will receive a FAPE); Springdale Sch. Dist. No. 50 v. Grace, 693 F.2d 41, 43 (8th Cir. 1982) (noting that even though a state school for the deaf might provide the best possible option for a student, the IDEA "does not require states to make available the best possible option") (emphasis in original)).  Were plaintiffs' interpretation of the LRE provision correct, "much of the IDEA would be unnecessary because all school entities (public or private) would be required to make all their programs available to all potential students, without regard to suitability, qualifications or academic ability." Ellenberg v. N.M. Military Inst., No. CV-04-00347 PK/DJS, slip op. at 29 (D.N.M. Feb. 7, 2005).  As the district court correctly noted, "plaintiffs focus on a freestanding substantive guarantee [the right to receive a FAPE in the least restrictive environment] without concern for the procedural mechanisms for implementing that guarantee." Id.

Because plaintiffs have failed to exhaust the IDEA's procedural mechanisms, we **REVERSE** the district court's grant of summary judgment in

favor of the defendants, and **REMAND** to the district court with instructions to dismiss the Ellenbergs' IDEA claim for lack of jurisdiction.[17]

## II

The Ellenbergs also pursue claims under Title II of the ADA[18] and § 504 of the RA.[19] Relying on this circuit's decision in Urban ex rel. Urban, the district court ruled that because plaintiffs' claim under the IDEA failed, the ADA and RA

---

[17] Because we conclude that plaintiffs have failed to exhaust the IDEA's administrative procedures before pursuing claims in federal court, we do not address whether under the IDEA NMMI is required to provide special education services to a student who is accepted by, or attends, NMMI.

[18] Title II of the ADA provides:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Regulations implementing the ADA prohibit a public agency from denying a disabled person "the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities." 28 C.F.R. § 35.130(b)(2).

[19] Section 504 of the RA provides:

No otherwise qualified individual with a disability in the United States, as defined in section 706(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

87 Stat. 394, as amended, 29 U.S.C. § 794(a).

claims must also fail.  <u>Ellenberg v. N.M. Military Inst.</u>, No. CV-04-00347 PK/DJS, slip op. at 39-40 (D.N.M. Feb. 7, 2005) (<u>citing</u> <u>Urban ex rel. Urban</u>, 89 F.3d at 727-28 (internal citations omitted)).  Because we hold that the district court lacked jurisdiction to address the IDEA claim, the district court's grant of summary judgment in favor of the defendants on these claims, based solely on its finding that the IDEA claim failed, was in error.

We must thus determine whether the dismissal of plaintiffs' IDEA claim for failure to exhaust requires us to also dismiss their RA and ADA claims for lack of jurisdiction.  When a plaintiff pursues a claim under the ADA or other law that protects the rights of disabled children, the IDEA "requires her to first exhaust its administrative procedures and remedies prior to commencing her ADA suit [or suit under other federal law] if she is '<u>seeking relief that is also available under</u>' the IDEA."  <u>Padilla ex rel. Padilla</u>, 233 F.3d at 1274 (citation omitted) (emphasis in original).

The IDEA permits plaintiffs to file a complaint "with respect to <u>any matter relating to</u> . . . the provision of a free appropriate public education."  <u>Hayes ex rel. Hayes</u>, 877 F.2d at 813 (<u>citing</u> 20 U.S.C. § 1415(b)(1)(E)) (emphasis and omission in original).  Thus, we have held that whenever a plaintiff brings a claim that is "educational in nature" purporting to challenge the provision of educational services by a local school district, the claim is "presumptively redressable" through the IDEA's administrative procedures.  <u>See</u> <u>Padilla ex rel.</u>

Padilla, 233 F.3d at 1275 (listing cases). This holds true regardless of what statute the plaintiff purports to cite as the basis for the suit. Id.; Hayes ex rel. Hayes, 877 F.2d at 812 ("In other words, when parents choose to file suit under another law that protects the rights of handicapped children-and the suit could have been filed under the [IDEA]-they are first required to exhaust the [IDEA's] remedies to the same extent as if the suit had been filed originally under the [IDEA's] provisions.") (internal citation omitted). The benefits of exhaustion fully support this rule, as it allows educational professionals to have the first crack at designing a program to meet a disabled student's specific needs.

Arguably, plaintiffs' ADA and RA claims are "educational in nature" as they seek resolution of a dispute involving the admission requirements and practices of NMMI, a secondary school. Based on our broad interpretation of the term available, see Cudjoe ex rel. Cudjoe, 297 F.3d at 1066 (citing Padilla ex rel. Padilla, 233 F.3d at 1274), the thrust of the relief the Ellenbergs requested under § 504 could be obtained through the IDEA and thus is presumptively redressable by its provisions.[20] However, the presumption regarding exhaustion is simply

[20] Specifically, they seek: (1) reversal of the administrative appeal officer and hearing officer's decisions, (2) a declaratory judgment that NMMI is bound by the IDEA and § 504, (3) an injunction requiring NMMI to begin complying with its obligations under the IDEA and § 504, (4) damages for the discrimination suffered by S.E. pursuant to § 504 and the ADA, (5) compensatory education, (6) damages for her lost educational opportunity, and (7) attorney fees and costs as allowed by state law.

that, a presumption, and with respect to certain claims presented here, plaintiffs have overcome it.

Plaintiffs contend that NMMI unlawfully discriminated against S.E. in violation of the RA and the ADA by denying her admission on the basis of her disability even though she was "otherwise qualified" to attend, and that NMMI's qualifying admissions standards are "facially discriminatory."[21] In the context of these pure discrimination claims, the IDEA offers no relief, for they do not relate to the provision of a FAPE in the least restrictive environment. Instead, they challenge the alleged discriminatory admissions practices of a state-funded

---

[21] The district court found that plaintiffs' claims under the IDEA, the RA, and the ADA were essentially indistinguishable. We understand the district court's frustration with plaintiffs, and recognize that their complaint and subsequent briefing did not provide the clearest articulation of the unique differences between the IDEA, the RA, and the ADA claims they assert. Arguably this failure below stemmed from plaintiffs' understanding that the district court precluded them from presenting their arguments regarding the RA and the ADA in its scheduling order requesting briefing on the IDEA claims, a position the Ellenbergs argued in their opening submission to the district court.

Nevertheless, plaintiffs pled allegations sufficient to establish the separate and distinct nature of the RA and ADA claims. For example, in paragraph 12 of the complaint, they allege that NMMI "had a written policy of excluding students with disabilities from admission to NMMI." In paragraph 13, they contend that this policy was discriminatory. In paragraph 36, they note that NMMI engaged in discrimination by refusing to admit S.E. During a hearing before the district court, NMMI's counsel recognized that plaintiffs were raising separate discrimination claims under § 504 and the ADA. In that same hearing, plaintiffs' counsel stated that the "Section 504 and ADA claims would stand alone" from the IDEA claim, but that such claims do not stand alone for purposes of state administrative procedures because "if there are no IDEA claims, a family does not have the power to file a Section 504 administrative grievance" with NMPED.

secondary school. As we noted previously, the Supreme Court has long-recognized that the IDEA is simply not an anti-discrimination statute.

Moreover, exempting plaintiffs from exhaustion in this circumstance prevents inefficiency and waste of judicial resources. Limited obligations are imposed on states under the IDEA. Educational experts who develop IEPs must identify the students' LRE and select an educational placement, but they do not decide which schools a student is otherwise qualified to attend. Administrative officers reviewing plaintiffs' IDEA claims must consider the same limited questions that we ask: (1) Has the student been given a FAPE?; and (2) Was the student given a FAPE in the least restrictive environment? Rowley, 450 U.S. at 206-07. At no point would the administrative process offer insight into the merits of a discrimination claim. Requiring exhaustion before the Ellenbergs could pursue their claims under the ADA and RA would create an anomolous result: Plaintiffs who concede a students' IDEA rights have not been violated, or have settled the IDEA claims, would be required to craft an IDEA claim and proceed through the state administrative process to determine if the students' IDEA rights have been violated. See W.B. v. Matula, 67 F.3d 484, 496 (3d Cir. 1995) (recognizing that plaintiffs would not be required to use the IDEA's administrative framework when they have settled their IDEA claims).

Turning to the merits of the RA and ADA claims, contrary to NMMI's suggestion, our precedent does not hold that a party's discrimination claims under

the RA and the ADA must automatically be dismissed if an IDEA claim fails.[22]

<hr />

[22] Both NMMI and the district court cited this court's decision in Urban ex rel. Urban for the proposition that if the state provides a student with a FAPE in the least restrictive environment, it has not violated § 504 or the ADA. In Urban ex rel. Urban, plaintiff argued that he was entitled under the ADA to reject the educational placement offered by the school district and attend his neighborhood school. This court noted that the administrative regulations promulgated by the Department of Education pursuant to § 504 "generally conform to the standards established by the IDEA." 89 F.3d at 728. Both regulations "use substantially the same language regarding a school district's obligation to evaluate each disabled child, create an IEP with parental input, and provide each disabled child with an appropriate education." Id. Thus, we concluded that "if a disabled child is not entitled to a neighborhood placement under the IDEA, he is not entitled to such a placement under section 504." Id. However, we specifically noted that "a federally-funded education system may violate § 504 when the school system's practices 'preclude the handicapped from obtaining system benefits realized by the nonhandicapped.'" Id. (citing N.M. Ass'n for Retarded Citizens, 678 F.2d at 855) (emphasis in original); see also Weber v. Cranston Pub. Sch. Comm'n, 245 F. Supp. 2d 401, 406 (D.R.I. 2003) (noting that § 504 is a "bludgeon to the IDEA's stiletto").

Adopting NMMI's reading of Urban ex rel. Urban would also contradict Congress' express legislative mandate that the IDEA should not be "construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(*l*). At least one scholar has provided a clear articulation of the interplay between claims under the IDEA and those brought pursuant to § 504:

> In contrast to the IDEA, Section 504 emphasizes equal treatment, not just access to a FAPE. In other words, the drafters of Section 504 were not only concerned with [a student] receiving a FAPE somewhere (as was the case with the IDEA), but also that a federally funded program does not treat [the student] differently because [she is disabled]. Under Section 504, a state special school cannot hide behind the justification that another public school might provide a FAPE; it must show that somehow [the student] does not qualify for admission. Unlike the IDEA, Section 504 does not only look at what is a FAPE, but also what is fair.

(continued...)

Any other interpretation of our caselaw would mean that a state educational institution that receives public funding could openly discriminate against applicants with disabilities so long as the state offered the student a FAPE in the least restrictive environment. Thus, even if plaintiffs conceded that New Mexico fully satisfied its IDEA obligations with respect to S.E., they could pursue claims under the ADA and the RA on the grounds that S.E. was precluded from receiving a state benefit – military-style education – provided to her non-disabled peers.

Because the district court failed to consider these claims independently from the IDEA claim, we **REVERSE** the district court's grant of summary judgment on the ADA and RA claims, and **REMAND** for reconsideration of these claims.

**IV**

Accordingly, we **REVERSE** the district court's grant of summary judgment in favor of NMMI on the IDEA claim, and **REMAND** with instructions to dismiss that claim for lack of jurisdiction. We **REVERSE** the district court's grant of summary judgment in favor of NMMI on the Ellenbergs' claims under Title II of the ADA and § 504 of the RA, and **REMAND** for reconsideration of the motion for summary judgment on the ADA and the RA claims.

---

[22](...continued)

Christopher J. Walker, Note, Adequate Access or Equal Treatment: Looking Beyond the IDEA to Section 504 in a Post-Schaffer Public School, 58 Stan. L. Rev. 1563, 1589 (2006).