Leslie MILLER, Plaintiff–
Appellant/Cross–
Appellee,

and

Jack Miller, on behalf of their minor
child, S.M., Plaintiff,

v.

BOARD OF EDUCATION OF the AL-
BUQUERQUE PUBLIC SCHOOLS,
Defendant–Appellee/Cross–Appellant.

Nos. 06–2344, 06–2345.

United States Court of Appeals,
Tenth Circuit.

May 11, 2009.

Gail Stewart of Steven Granberg, P.A., Albuquerque, NM, for Plaintiff–Appellant/Cross–Appellee.

Andrea K. Robeda (Michael L. Carrico with her on the briefs) of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque,

NM, for Defendant–Appellee/Cross–Appellant.

Before BRISCOE, GORSUCH, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

Plaintiff–Appellant/Cross–Appellee Leslie Miller, on behalf of her son, S.M., filed suit under the Individuals with Disabilities Education Act ("IDEA"), alleging the inadequacy of the findings and remedy received under IDEA's administrative process for the failure of the Albuquerque Public School District ("APS") to provide appropriate reading instruction and accommodation of S.M.'s reading disabilities. She also filed discrimination claims stemming from the same issues under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. The district court held that the administrative remedy was adequate and granted summary judgment for APS on her discrimination claims. Ms. Miller appeals the district court's dismissal of her case and its ruling on attorney's fees and costs. APS cross-appeals, challenging the district court's denial of its motion to amend its answer to assert a counterclaim relating to the propriety of certain educational expenses that it was ordered to pay in the administrative proceedings. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM.**

## I. BACKGROUND

### A. Individuals with Disabilities Education Act

The IDEA, 20 U.S.C. §§ 1400 et seq.,[1] "is a spending statute that imposes

---

1. Because this case involves an administrative process begun on November 1, 2004, and a civil suit filed on May 4, 2005, the version of the statute cited throughout this opinion is the

obligations on the states to provide certain benefits in exchange for federal funds." *Ellenberg v. N.M. Military Inst.*, 478 F.3d 1262, 1274 (10th Cir.2007). One of its core purposes is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

The primary tool in assuring that a free, appropriate public education ("FAPE") is provided to all eligible children with disabilities is the requirement that the state create an individualized education plan ("IEP") for each disabled child. *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1043 (10th Cir.1993); *see* 20 U.S.C. § 1412(a)(4) (instituting IEPs). "The IEP is a written statement that sets forth the child's present performance level, goals and objectives, specific services that will enable the child to meet those goals, and evaluation criteria and procedures to determine whether the child has met the goals." *Romer*, 992 F.2d at 1043. IEPs must be reviewed at least annually and revised as appropriate. 20 U.S.C. § 1414(d)(4). For the special education and related services provided to a student to constitute a FAPE, they must be "provided in conformity with the [IEP]." *Id.* § 1401(8)(D).

In order to support Congress's goal to "mainstream" disabled children, the IDEA provides that such students must be educated "[t]o the maximum extent appropriate ... with children who are not disabled" in a "regular educational environment." 20 U.S.C. § 1412(a)(5)(A) (detailing the meaning of the statutory right

to the "least restrictive environment"). Disabled students may only be removed from the regular classroom setting "when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*; *see Ellenberg*, 478 F.3d at 1268.

When parents believe their child is not being provided a FAPE in the least restrictive environment, they are given "an opportunity to present complaints with respect to any matter relating to the ... educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). After filing a complaint, they are entitled to an impartial due process hearing. *Id.* § 1415(f). If that hearing is held before a local education agency such as a school board, "any party aggrieved" by the resulting decision may appeal to the state education agency. *Id.* § 1415(g). Once state administrative procedures are exhausted, "[a]ny party aggrieved by the findings and decision" may file a civil action in state or federal court. *Id.* § 1415(i)(2); *see Ellenberg*, 478 F.3d at 1269–70.

### B. Educational Background

S.M. has qualified for special education since the first grade because of severe reading disabilities. In 2002, after attending private school for a number of years, he enrolled at Cleveland Middle School in the APS system for sixth grade. S.M.'s IEP for sixth grade provided that he would attend two regular education classes: physical education and band. It

1997 reauthorization of the IDEA, which was effective from April 29, 1999, to June 30, 2005. *See* Individuals with Disabilities Education Act Amendments for 1997, Pub.L. No. 105–17, 111 Stat. 37. The Individuals with

Disabilities Education Improvement Act of 2004, which took effect on July 1, 2005, does not apply retroactively to this claim. *See* Pub.L. No. 108–446, 118 Stat. 2647.

also provided that he be placed in special education for other subjects, although his special education class frequently joined regular education social studies and science classes. His special education teacher provided reading instruction using two reading programs, both of which employed Orton–Gillingham approaches.[2] His IEP also stated that APS would provide access to Kurzweil, a computer program designed to assist the reading disabled by reading aloud any scanned text. A speech language pathologist assisted him in using it.

S.M.'s initial IEP for seventh grade placed him in a resource room with a special education teacher for reading and language arts. That special education teacher also was responsible for S.M.'s instruction in math, which was taught in full inclusion with a regular education class. His remaining classes were regular education. Kurzweil also was made available to S.M. After three weeks of this placement, S.M. was removed at the request of his parents.

Under a revised IEP, he was placed in a self-contained classroom with a team teaching approach. A special education teacher taught reading, language arts, and social studies, while the team teacher taught math and science. His reading instruction involved one of the Orton–Gillingham programs that had been used in sixth grade. His revised IEP also called for APS to provide "books on tape," audiobook versions of his class textbooks, as a modification to enable S.M. to succeed in the general education environment. It ap-

pears that although S.M. enjoyed audiobooks that were played for the whole class, he resisted using them on his own. In March 2004, S.M.'s parents (i.e., the Millers) arranged for private reading instruction from an Academic Language Therapy ("ALT") Therapist. S.M.'s parents then instructed his special education teacher at APS to refrain from giving reading instruction. His parents also purchased WYNN software, a computer program that scans printed texts and reads them aloud, to enable S.M.'s access to school textbooks.

Although S.M. was initially placed in a self-contained classroom at the beginning of eighth grade, once a new IEP was developed he joined regular education classes for social studies, math, and literature, along with two electives. For his remaining classes, he received specialized instruction in a resource room. His IEP reiterated his need for Kurzweil "or like" software and stated that it would be made available in his teacher's room. Admin. R. at 132, 142. The IEP also noted "[l]iterature books on tape to be ordered." *Id.* at 142. However, S.M.'s resource room teacher was not yet certified, was teaching special education on waiver, only had minimal training with any Orton–Gillingham approach, and used a different reading program. APS continued to be on notice that S.M.'s parents were rejecting the reading instruction provided by the school district; further, S.M.'s parents asked APS to allow the private instructor to provide ALT during the school day, but APS refused.

**2.** As other courts have recognized, the Orton–Gillingham method is "a language based remedial program for students who have specific difficulties in the phonological encoding and decoding of the language." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir.2003) (internal quotation marks omitted); *see also Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 244 n. 3 (3d Cir.1999)

("The Orton–Gillingham technique is a linguistic-phonetic approach towards reading with an emphasis on teaching the student to learn how to decode words." (alteration and internal quotation marks omitted)). The programs at issue here are "research-based, multi-sensory, systematic, sequential and cumulative approaches to teaching phonics and reading." Admin. R. at 15.

## C. Prior Proceedings

### 1. Administrative Hearings

In October 2004, while S.M. was in eighth grade, his parents filed a request for a due process hearing against APS on his behalf. They asserted that S.M. had not received FAPE for the sixth, seventh, and eighth grades. The Due Process Hearing Officer ("DPHO") concluded that the Millers failed to carry their burden on either their claim that S.M. was not mainstreamed to the extent possible in the sixth, seventh, and eighth grades, or their claim that S.M.'s reading instruction was not reasonably calculated to confer meaningful educational benefit in the sixth and seventh grades. The DPHO observed that the Millers sought to use the hearing to discuss "broad, systemic and philosophical issues" about APS's "system for placing reading disabled students, or lack thereof." Admin. R. at 27–28. The DPHO concluded that "review of a District-wide system is beyond the purview of this DPHO." *Id.* at 28.

However, the DPHO did partially rule in the Millers' favor, concluding that the teacher providing specialized instruction in the eighth grade was not qualified to teach reading to S.M. This, the DPHO held, was a denial of FAPE because placement with this teacher was not reasonably calculated to confer meaningful educational benefit. The DPHO ordered APS to reimburse the Millers for the cost of the WYNN software, required that a laptop computer be provided to S.M. to accommodate use of both the Kurzweil and WYNN programs, and held APS liable for the costs of ALT for the eighth grade (or at least until APS complied with the terms of the decision).

APS appealed this decision, and the Millers filed a cross-appeal. The Administrative Appeal Officer ("AAO") agreed with most of the DPHO's conclusions. The AAO found that the DPHO did not err in excluding testimony about an allegedly system-wide policy of refusing to provide ALT regardless of need because the evidence did not establish that S.M. needed ALT. Similarly, the AAO concluded that the DPHO did not err in declining to consider problems other students faced in obtaining "books on tape." Admin. R. at 300–01 ("Because a systemic remedy is not needed here, exclusion of evidence of the problems faced by other students was proper.").

The AAO agreed that S.M. had been denied FAPE in eighth grade, but found that there had been additional denials as well. Although the instruction in sixth grade was appropriate to meet S.M.'s needs, APS had denied FAPE to S.M. by failing to comply with his IEP in seventh grade and failing to reconvene his IEP team when conditions changed. FAPE was denied because S.M.'s IEP for seventh grade required "books on tape" and they were not provided. Likewise, FAPE had been denied because neither Kurzweil nor "books on tape" were available to S.M. in eighth grade, despite their inclusion in his IEP. Accordingly, the Millers were granted reimbursement for the ALT instruction in both seventh and eighth grades to remedy the denial of FAPE, along with reimbursement for the WYNN software.

### 2. APS v. Miller (Dist.Ct. No. CIV–05–487)

Soon after the AAO's decision, APS filed an application for a preliminary injunction in federal court. APS sought to enjoin the enforcement of the AAO's order requiring reimbursement to the Millers for private ALT tutoring on a continuing basis. APS argued that the AAO improperly had chosen between viable methodologies by ordering compensation for private ALT instruction despite also concluding that an

appropriate reading methodology was available through APS. APS asserted that it was not following the ordinary method of appealing the AAO's decision to federal district court because "by the time the case reaches a decision, APS' claim will be moot because the time for reimbursement will have expired." Aplt.App. at 507–08. The Millers filed a motion to dismiss on three grounds: lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim on which relief can be granted.

The district court denied the preliminary injunction, granted the motion to dismiss, and dismissed the action without prejudice for lack of jurisdiction. The district court concluded that the case was governed by the IDEA's "stay put" provision, which provides that "during the pendency of any proceedings conducted pursuant to this section ... the child shall remain in the then-current educational placement." 20 U.S.C. § 1415(j). Stating that an administrative decision in favor of the parents represented the child's current educational placement, the district court held that it could not apply equitable principles to override Congress's policy choices articulated in the statute. Nevertheless, the district court also reviewed the claim under traditional equitable doctrine and concluded that the interests weighed against granting the injunction. To the extent the case was to be treated as a civil action, the district court noted that APS sought only a preliminary injunction and stated that other aspects of the decision could be litigated in the separate civil action that was pending.

### 3. Miller v. APS (Dist.Ct. No. CIV–05–502)

Less than a week after APS filed its application for a preliminary injunction, the Millers filed a civil action in federal court. They sought a partial review and modification of the AAO's decision under the IDEA, 20 U.S.C. § 1415(i)(2)(A), and raised discrimination claims under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. § 12132. APS filed an answer to the complaint almost one month before the district court ruled on its application for a preliminary injunction in the related case. Six days after the district court dismissed APS's injunction case, APS filed a motion to dismiss the Miller's civil action for lack of personal jurisdiction and, in the alternative, requested leave to amend its answer to add a counterclaim.

Discovery proceeded while the motion to dismiss was pending, and the Millers voluntarily dismissed the damages portion of their discrimination claims, leaving only the IDEA claim and the claims for equitable relief under § 504 and the ADA. Shortly before the end of discovery, in January 2006, the district court denied APS's motion to dismiss and to amend. In denying leave to amend as futile, the district court pointed to APS's assertion in its injunction case that the reimbursement issue would be moot if relief were not provided by August 2005 and reiterated the "stay put" provision analysis it had previously undertaken, concluding that "APS may not avoid or postpone its duty to reimburse the Millers based on the fact that the litigation is still pending." Aplt.App. at 102. The district court noted that, while this denial prevented APS from challenging the compensatory education award through August 2005, it did not preclude litigating other aspects of the AAO's decision.

The parties filed several other motions pertinent here. APS filed a motion for summary judgment on the discrimination claims. The Millers filed a motion to bifurcate the discrimination claims and certi-

fy them as a Federal Rule of Civil Procedure 23(b)(2) class action for declaratory and injunctive relief based on APS's system-wide failure to provide "books on tape." The Millers also filed a motion under 20 U.S.C. § 1415(i)(2)(B)(ii) seeking to introduce additional evidence, including the evidence excluded in the administrative proceedings that concerned whether there were system-wide problems with APS's provision of "books on tape."

The district court entered a final ruling disposing of all claims. The court denied the motion to certify a class action after considering the threshold requirements of Fed.R.Civ.P. 23(a) and the considerations of Fed.R.Civ.P. 23(b)(2). Exercising its discretion over whether to admit additional evidence, the court denied the Millers' motion because there was no basis to review administrative evidentiary rulings on issues where the Millers had been awarded adequate relief and the relationship of the evidence to other issues was too attenuated. The district court then rejected all of the Millers' IDEA claims on the merits, affirming the AAO on all grounds. The court further found that APS was entitled to summary judgment on both of the discrimination claims.

Because the Millers had not prevailed on any of the substantive claims in their complaint, the district court ruled that they were not entitled to attorney's fees and costs for the civil action. The Millers had sought $10,706.77. The court did award the Millers attorney's fees and costs in connection with the administrative proceedings, but less than they had asked for. Specifically, the court granted them

$8,751.19 in attorney's fees and costs, for what the court described as "their limited success in the administrative proceedings." Aplt.App. at 477. That was only a fraction of the $23,014.21 the Millers had sought.[3] Lastly, the Millers had sought $6,654.16 in attorney's fees and costs for their defense against APS's preliminary injunction action (i.e., Dist.Ct. No. CIV–05–487). The district court, however, denied these fees and costs because, *inter alia*, it found that there was "no explicit statutory authority" for granting them. *Id.* at 483.

Following the district court's ruling, Ms. Miller filed this appeal,[4] seeking reversal of the district court's decision on three grounds: the refusal to allow additional evidence, the summary judgment concerning the § 504 and ADA discrimination claims, and the attorney's fees and costs determination. APS then cross-appealed the denial of its motion for leave to amend to file a counterclaim.

## II. DISCUSSION

### A. Exclusion of Additional Evidence

Ms. Miller argues on appeal that both the district court and the administrative officers erred in refusing to hear additional evidence alleging systemic dysfunction in the delivery of "books on tape." She asserts that this evidence would show the inadequacy of the remedy provided in the administrative proceedings and affirmed by the district court.

▮ We review the district court's decision regarding the refusal to consider additional evidence pursuant to the IDEA for abuse of discretion.[5] *See O'Toole ex*

---

3. The Millers actually informed that district court that they were prepared to reduce their attorney's fees and costs request by $28, because of their inability to document electronic research expenses that apparently they thought had been incurred during the administrative proceedings. Aplt.App. at 475.

4. Ms. Miller's husband did not participate in this appeal.

5. We likewise apply an abuse of discretion standard to the relief fashioned by the district court because of the discretion granted to the court by the provision that immediately fol-

*rel. O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233*, 144 F.3d 692, 708–09 (10th Cir.1998) (holding that denial of a motion for an enlargement of time to submit additional evidence should be reviewed for abuse of discretion); *accord Deal ex rel. Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 850 (6th Cir.2004) ("A district court's decision regarding additional evidence in an IDEA case will be reviewed for abuse of discretion."). The district court's discretion to accept additional evidence is limited, however, because "such evidence is merely supplemental to the administrative record" and federal court proceedings "must maintain the character of review and not rise to the level of a *de novo* trial." *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir.2004).

■■■ Ms. Miller has not given us any basis for concluding that the district court abused its discretion in refusing to hear additional evidence that allegedly would have shown a systemic dysfunction in the delivery of "books on tape." In determining whether the district court abused its discretion by not allowing additional evidence, we look to whether the proposed evidence was *relevant* to the *issue properly before the district court. See Deal*, 392 F.3d at 850–51 (concluding that the district court had not abused its discretion in permitting additional evidence where witness evidence was "limited in scope to the extent to which their observations were *relevant* to the challenged decisions for the [specific] school year" and the "district court took great care to limit testimony to matters *relevant* to the [disputed] IEP" (emphases added)); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir.1995)

("While a district court appropriately may exclude additional evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence *relevant*, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved." (emphasis added)); *see also A.Y. ex rel. B.Y. v. Cumberland Valley Sch. Dist.*, 569 F.Supp.2d 496, 507–08 (M.D.Pa.2008) (applying the *Susan N.* standard to admit evidence because it "may shed light on" one of the issues before the court but explaining that the evidence would not be considered in connection with a separate question as to which it was not relevant); *A.S. v. Madison Metro. Sch. Dist.*, 477 F.Supp.2d 969, 972 (W.D.Wis.2007) (rejecting evidence that was "not relevant to the situation at the time the District created the IEP for [the student]").

### 1. Issue Properly Before the District Court

The issue properly before the district court was "whether the AAO should have found additional IDEA violations regarding Books on Tape and awarded further relief with respect to such violations." Aplt.App. at 378. Although the AAO partially ruled in Ms. Miller's favor regarding "books on tape," Ms. Miller claimed additional violations of IDEA on this issue. *See* Aplt.App. at 11–12 ("The IDEA administrative decisions erred by not concluding that the District's failure to offer Books on Tape ... for all necessary textbook ... reading for all relevant school years constituted a failure to provide access to the general curriculum and failure to provide necessary special education services and a deprivation of FAPE.").

lows the evidence-supplementing provision. *See* 20 U.S.C. § 1415(i)(2)(B)(iii) (stating that a district court "shall grant such relief as the court determines is appropriate"); *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520

F.3d 1116, 1127–28 (10th Cir.2008) ("[O]ur review of the district court's remedial decision is limited to assessing only whether it amounts to an abuse of discretion.").

The AAO ruled against·Ms. Miller regarding her sixth grade claim, concluding that APS had not erred by declining to provide "books on tape" that year because the school had provided the Kurzweil system, which had the identical purpose of providing auditory access to written text. The AAO ruled in Ms. Miller's favor regarding·"books on tape" in seventh and eighth grades. The seventh grade IEP required "books on tape," but APS did not provide them, nor did APS sustain its burden of showing that their absence had a de minimis impact on provision of FAPE. The eighth grade IEP generally required access to the Kurzweil system and, more narrowly than the previous IEP, promised "books on tape" only for a language arts class. See Admin. R. at 142 ("Literature. books on tape to be ordered."). However, at the time of the due process hearing, neither Kurzweil nor "books on tape" had been provided.

The AAO affirmed the two remedies that had been provided by the DPHO for these failures: (1) reimbursement of the cost of the WYNN software that the Millers had used to compensate for the lack of auditory access to written material, and (2) requiring APS to conduct S.M.'s IEP in the spring so that "books on tape" could be obtained in a timely fashion before the following school year. The AAO concluded that no "systemic remedy" was needed and that rearranging the timing of the IEP was sufficient to address any concerns, "[t]o the extent the record shows that [APS] was not able to timely provide textbooks on tape." Admin. R. at 300–01.

### 2. Relevance

The additional evidence—evidence allegedly showing systemic dysfunction in the delivery of "books on tape"—is not relevant to the issue concerning additional IDEA violations relating to "books on tape" that was properly before the district court. Ms. Miller does not assert that the additional evidence is relevant to that issue. Instead, she argues that because APS failed to provide what it promised in the seventh and eighth grade IEPs; she should have been allowed to prove with the additional evidence that APS again will fail to perform its obligations, despite the administrative decisions. See Aplt. Opening Br. at 30 ("[T]he reasons for [the prior] deprivation of the service are *relevant* if the remedy is going to be entrusted, once again, to the school system that failed to provide the identified service in the first place."); see also id. at 28 ("[C]reation of [an] equitable remedy requires factual understanding of the school district's systemic dysfunction."); id. at 30 ("[T]he denial of FAPE is sure to be repeated," because "there is no existing infrastructure for provision of [these] necessary special education services.").

As an initial matter, even if the evidence showed that APS "is not providing Books on Tape to its thousands of students with learning disabilities," Aplt. Opening Br. at 29, that would not prove the inadequacy of the remedy *in this case*. Contrary to Ms. Miller's argument, the district court agreed with the AAO that "the provision of some alternative form of assistive technology, such as the Kurzweil system, in lieu of Books on Tape is not a *per se* violation of the IDEA in this case" and approved the AAO's remedy, which involved "further evaluations and meetings by the IEP team with respect to this issue instead of simply binding the student and the school district to a particular kind of aid or technology in future years." Aplt.App. at 376–78.

More importantly, the attempt to present such evidence is an effort to resurrect the class action that the district court rejected. The district court's denial of her motion to certify a class action is not be-

fore us because Ms. Miller did not appeal it. We will not permit her to proceed as though this were a class action. The only question relevant here is S.M.'s relief. *See McQueen ex rel. McQueen v. Colo. Springs Sch. Dist. No. 11*, 488 F.3d 868, 874 (10th Cir.2007) ("The role of the § 1415 process is to resolve a complaint about the education of a specific child."); *Diaz–Fonseca v. Puerto Rico*, 451 F.3d 13, 42 (1st Cir. 2006) ("[T]he evidence at trial did not show ... that the failures are systemic. Plaintiffs represent no one but themselves, and they are not entitled to relief that goes beyond the scope of what is necessary to remedy the harms caused to them." (citation omitted)).

Essentially, Ms. Miller is requesting an opportunity to convince the court that APS will not or cannot comply with its future obligations. Ms. Miller's case, however, is not unlike many other IDEA cases involving school districts' failures to comply with the applicable IEP. We see no reason to oblige the district court to consider additional evidence of past failures in relation to other students to support the inherently speculative conclusion that APS will not provide the necessary services in the future.

We cannot lightly presume that school districts will refuse to comply with the relief ordered. If APS were to fail to conduct the ninth grade IEP and timely acquire any "books on tape" or other assistive technology required by that IEP, Ms. Miller could return to court to enforce the awarded relief. *See Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 116 & n. 3 (1st Cir.2003) (concluding that despite "[t]he lack of a clause in IDEA that specifically provides for judicial enforcement of administrative orders," the term "parties aggrieved" in § 1415(e)(2) includes plaintiffs "who are aggrieved by the school system's failure ... to comply with the hearing officer's continuing, valid, and final order"); *see also Hunter ex rel. Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 278 (3d Cir.1996) (declining to enforce under § 1415(e)(2) but concluding that 42 U.S.C. § 1983 "provides an adequate vehicle for a suit to enforce an IDEA administrative decision"). We do not consider Ms. Miller's option to return to court to be an ineffective remedy.

■■■ We are confident that the overwhelming majority of school districts will meet their obligations under the IDEA once their duties have been crystalized in the administrative process and federal court review. Permitting preemptive challenges to the adequacy of the remedy on a speculative theory of noncompliance would not be appropriate.[6]

6. The impropriety of such a review becomes especially clear once its implications are considered. If we concluded that APS was unlikely to comply with the administrative relief, what additional remedy could be ordered? Ms. Miller would have us "examin[e] and correct[ ] underlying dysfunction," Aplt. Reply Br. at 29, presumably by ordering changes to the "inadequate infrastructure, training and supervision to deliver the necessary knowledge to APS staff about why students with dyslexia needed access to auditory texts." Aplt. Opening Br. at 24. However, we decline to involve ourselves in the structuring of school systems. The Supreme Court has warned that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (internal quotation marks omitted). Accordingly, "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Id.* at 207, 102 S.Ct. 3034. Here, neither the AAO nor the district court identified a preferred method. Nevertheless, Ms. Miller continues to press her case that "books on tape" must be provided, and she would have us intervene in the school system's procedures to assure the avoidance of future denials regarding what in essence is a question of methodology. In

### 3. "Any Matter"

■ Ms. Miller argues that it is wrong to find the evidence irrelevant because the IDEA provides "an opportunity to present complaints with respect to *any matter* relating to ... the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6) (emphasis added). However, this language does not provide blanket coverage for any issue a parent wishes to raise. The Supreme Court has warned against judicial encroachment on educational policy. *See Rowley*, 458 U.S. at 208, 102 S.Ct. 3034. And in *McQueen*, we observed that "[t]he role of the § 1415 process is to resolve a complaint about the education of *a specific child.*" 488 F.3d at 874 (emphasis added). Ms. Miller has not persuaded us that S.M.'s relief will be inadequate absent alteration in APS's entire system.

The Supreme Court's decision in *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007), does not support Ms. Miller's unbounded interpretation of "any matter." In *Winkelman*, the Court addressed the question of whether the rights protected by the IDEA belonged to the child alone or to both the parents and the child, concluding that various provisions "accord parents independent, enforceable rights [under the IDEA]." 127 S.Ct. at 2002. In reaching its conclusion that parents were also real parties in interest (and thus able to proceed unrepresented by counsel), the Court examined § 1415(b)(6). The Court described § 1415(b)(6) as providing "[a] wide range of review" and as "empower[ing] parents to bring challenges based on a broad range of issues." *Id.* at 2002, 2004. It also noted more generally that the IDEA contained "provisions for expansive review and extensive parental involvement." *Id.* at 2002. The Court concluded that, because the IDEA "does not differentiate ... between the rights accorded to children and the rights accorded to parents," a parent may be "a 'party aggrieved' for purposes of § 1415(i)(2) with regard to 'any matter' implicating these rights." *Id.* at 2004.

Our conclusion that the additional evidence was not relevant here is not undercut by the Supreme Court's commentary about the breadth of the "any matter" language. The Court's analysis was focused on parents' role in the statutory procedures, and its general remarks provides no guidance regarding the outer boundaries of "any matter." We agree that parents can bring challenges to a broad range of issues. But where a parent has been awarded relief that would be adequate if complied with, we have no obligation to permit a speculative argument about the school district's inability to comply with that award. Because the evidence was not relevant to the district court's review of whether additional relief was appropriate, we cannot find the exclusion of the evidence to be an abuse of

*O'Toole*, we applied *Rowley* to reject an attempt to introduce evidence about which methodology best serves a hearing impaired child. *See O'Toole*, 144 F.3d at 709. We noted *Rowley*'s assertion that " 'once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.' " *Id.* (quoting *Rowley*, 458 U.S. at 208, 102 S.Ct. 3034). And we concluded that this was "precisely the kind of issue which is properly resolved by local educators and experts." *Id.* Accordingly, we declined "to find error in the refusal by the administrative officers to engage in a dispute about methodology." *Id.* Similarly, here, we will not preemptively intervene to manage APS's methods of providing the ordered relief until they have actually failed to comply.

discretion.[7]

## B. Discrimination Claims

Ms. Miller challenges the district court's grant of summary judgment to APS on her discrimination claims under § 504 of the Rehabilitation Act and Title II of the ADA.[8] Because these provisions involve the same substantive standards, we analyze them together. *See Urban ex rel. Urban v. Jefferson County Sch. Dist. R–1,* 89 F.3d 720, 728 (10th Cir.1996) ("[W]e analyze [plaintiff's] ADA claim by reference to section 504's standards. . . ."). We review the grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. *Rost ex rel. K.C. v. Steamboat Springs RE–2 Sch. Dist.,* 511 F.3d 1114, 1118–19 (10th Cir. 2008). Summary judgment is appropriate only if the relevant records "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Although Ms. Miller's complaint had alleged discrimination involving both ALT and "books on tape," on appeal she narrows her claim, basing her argument only on the failure to provide "books on tape" during the seventh grade year. She seeks declaratory and injunctive relief, asserting that APS's admitted failure to provide "books on tape" "was *per se* discrimination

based on [S.M.'s] disability." Aplt. Opening Br. at 35, 37. With regard to this specific claim, the parties agree that there is no dispute over any material fact. Although Ms. Miller did not file a cross-motion for summary judgment, her arguments in effect assert that she should receive summary judgment on these claims.

In granting summary judgment, the district court bifurcated the claims into two distinct categories. First, the court ruled that the claims were precluded to the extent that they were based on the same acts as the IDEA claim raised in federal court. Second, to the extent the discrimination claims were not precluded—to the extent they relied on the portions of the AAO's decision which found in Plaintiffs' favor— the court ruled that Ms. Miller failed to make an adequate showing of all of the essential elements of the claims to withstand summary judgment. Moreover, it held, even if her showing on the elements was sufficient, the relief she sought was not available.

We need not address the district court's discussion of preclusion or relief because the district court's holding correctly noted Ms. Miller's failure to make the required showing as to the essential elements of her claims. Because of Ms. Miller's failure, those claims cannot survive summary judgment. *See Adler v. Wal–Mart Stores,*

---

7. *See also West Platte R–II Sch. Dist. v. Wilson,* 439 F.3d 782, 785 (8th Cir.2006) (holding that a district court did not abuse its discretion in excluding evidence related to progress of student subsequent to administrative hearing, "[c]onsidering the vast and detailed administrative record that was compiled, together with the fact that we normally determine these issues based solely on the administrative record").

8. Section 504 provides:
No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .
29 U.S.C. § 794(a).
Title II provides:
[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
42 U.S.C. § 12132.

*Inc.,* 144 F.3d 664, 670 (10th Cir.1998) ("If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial.").

 "A prima facie case under § 504 consists of proof that (1) plaintiff is handicapped under the Act; (2) he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff." *Hollonbeck v. U.S. Olympic Comm.,* 513 F.3d 1191, 1194 (10th Cir.), *cert. denied,* —— U.S. ——, 129 S.Ct. 114, 172 L.Ed.2d 240 (2008); *see also Gohier v. Enright,* 186 F.3d 1216, 1219 (10th Cir.1999) (holding that the general standard under Title II of the ADA requires proof that (1) plaintiff "is a qualified individual with a disability," (2) who was "either excluded from participation in or denied the benefit of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity," and (3) "such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability").

 Ms. Miller has not adequately established the discrimination element. She relies exclusively on the AAO's determination that there was a denial of FAPE under the IDEA.[9] However, the IDEA and § 504 differ, and a denial under the IDEA does not ineluctably establish a violation of § 504. *See Mark H. v. Lemahieu,* 513 F.3d 922, 933 (9th Cir.2008) ("Plaintiffs who allege a violation of the FAPE requirement contained in [the U.S. Department of Education's] § 504 regulations . . .

may not obtain damages simply by proving that the IDEA FAPE requirements were not met."); *see also* 34 C.F.R. § 104.33(b)(2) ("Implementation of an [IEP under the IDEA] is *one means* of meeting" the substantive provisions of the definition of FAPE in the § 504 regulations (emphasis added)).

Ms. Miller has fallen prey to a basic logical fallacy when she argues that "[i]f provision of FAPE is *per se* provision of education free from disability discrimination, then denial of FAPE is *per se* denial of education free from disability discrimination." Aplt.App. at 282–83. Although we adopted this initial premise in *Urban, see* 89 F.3d at 728, the conclusion does not necessarily follow. The mere fact that complying with the IDEA is *sufficient* to disprove educational discrimination does not mean that every violation of the IDEA necessarily *proves* a discrimination claim. Ms. Miller has done no more than point to the AAO's decision and, therefore, has failed to adequately show that the program discriminated against S.M.—an essential element of her discrimination claims. Discrimination claims may not be tacked on as an afterthought to IDEA claims, but must be litigated in their own right. The district court did not err in granting summary judgment.

## C. Attorney's Fees

 The IDEA provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). For this

---

9. *See* Aplt. Opening Br. at 35–36 ("The failure to supply the service identified on the IEP (Books on Tape) was *per se* discrimination based on Plaintiff's disability. The IEP team had determined that Plaintiff *needed* the Books on Tape to access education and so the *failure to provide* the service necessary to access education was because of Student's disability.").

purpose, the parents prevail " 'when actual relief on the merits of [the child's] claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.' " *Urban,* 89 F.3d at 729 (quoting *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). We review the decision whether or not to award attorney's fees and costs for abuse of discretion. *Id.* at 728.

Ms. Miller sought attorney's fees and costs for three discrete phases of the litigation: (1) the administrative proceedings, (2) the defense against APS's preliminary injunction lawsuit, and (3) this civil action. The district court awarded attorney's fees and costs for the administrative proceedings, but it reduced them because Ms. Miller only prevailed in part and granting the full amount requested would have been unreasonable. The court refused to grant fees and costs to Ms. Miller for defending against the injunction suit or for her own civil action because she was not the "prevailing party" in either case.

### 1. Administrative Proceedings

■ Ms. Miller sought $23,014.21 in fees and costs in conjunction with the administrative proceedings. The district court granted only $8,751.19, finding that her limited degree of success and the straightforward nature of the necessary proof made a significantly smaller award reasonable. Ms. Miller argues (1) that her fees "cannot have been unreasonable when Plaintiff prevailed and billed *one third less* than the attorneys for the school district" during the same period, (2) that the degree of success factor should not be applied to IDEA cases, or at least not to this case, because the relevant definition of "prevailing party" relates to any significant change in legal obligations, (3) even if the degree of success is applicable, its application

should recognize the significance of the financial reimbursement award, and (4) the district court overstated the simplicity of the claims because the statute offers limited guidance and APS "put out extraordinary effort to defeat these claims." Aplt. Opening Br. at 43–44. Unpersuaded by any of these arguments, we find no abuse of discretion in this portion of the district court's decision.

■ Under *Farrar,* while the "magnitude of the relief obtained" is irrelevant for determining the prevailing party, the "degree of the plaintiff's overall success goes to the reasonableness of a fee award." 506 U.S. at 114, 113 S.Ct. 566 (internal quotation marks omitted); *see also Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (identifying "degree of success obtained" as "the most critical factor" in the reasonableness analysis). We have previously relied on the "degree of success" analysis in reviewing IDEA claims. *See Urban,* 89 F.3d at 729 (observing that the reasonableness of an award "depends, in part, upon the degree of success obtained by the plaintiff," and concluding that although plaintiff partially prevailed, "we cannot say that he succeeded to the degree necessary to warrant an award of attorney's fees"). Most of the other circuits do the same. *See Aguirre v. L.A. Unified Sch. Dist.,* 461 F.3d 1114, 1119 (9th Cir.2006) (collecting cases). Therefore, the district court did not err in examining Ms. Miller's degree of success. Nor did the district court misstate the significance of her success by observing that she had sought far more than she gained and did not prevail on her "central contention." Aplt.App. at 485.

Applying the traditional factors listed in *Hensley,* the district court found that the legal issues were not complex issues of first impression but "relatively straightforward and easily provable violations of the

IDEA during a discrete period of time," as evidenced by the substantial settlement offer. Aplt.App. at 493. And because the amount awarded in other cases is also a factor under *Hensley*, the district court noted that courts in other IDEA cases also have found reasons to reduce the fee award. Ms. Miller has directed us to nothing demonstrating that the district court's conclusions are exceptional or rise to an abuse of discretion.[10]

### 2. APS v. Miller (Dist.Ct. No. CIV–05–487)

■ The district court held that Ms. Miller could not qualify for fees and costs totaling $6,654.16 under § 1415(i)(3)(B) because APS's injunction suit was not an "action or proceeding brought under this section" and because Ms. Miller was not a "prevailing party" as the case was dismissed without prejudice for lack of jurisdiction. We need not resolve whether Ms. Miller was a "prevailing party" because she may not seek attorney's fees and costs here for defense of a separate case. When the district court dismissed APS's case, Ms. Miller could have sought attorney's fees and costs. However, Ms. Miller did not do so, nor has she indicated a reason that precluded her from doing so. As APS notes, an application for attorney's fees and costs might have influenced its decision whether to appeal that dismissal. Ms. Miller has not identified any case law that suggests that a party should be permitted to recover fees and costs related to a separate case. Section 1415(i)(3)(B) does not provide authority to grant fees and costs with regard to a separate action that was not "brought under" the IDEA.

Ms. Miller argues that fees and costs are appropriate because the defense was "necessary to uphold the procedural scheme for IDEA review and to protect the remedy awarded" and because the Court "had to rely [on] and interpret IDEA" to dispose of the case. Aplt. Opening Br. at 41–42 (emphasis omitted). She reasons that to deny fees and costs would be "unfair" in light of the chance that "[w]ithout defense of the injunction action, APS could have succeeded in eliminating the AAO's relief." Aplt. Reply Br. at 47. Assuming *arguendo* that this argument might have supported an application for fees and costs *in the injunction case*, it does not create a justification for fees and costs under § 1415(i)(3)(B) in this case.

### 3. Miller v. APS (Dist.Ct. No. CIV–05–502)

■ With regard to Ms. Miller's civil suit, the district court denied $10,706.77 in fees and costs, concluding that "[the Millers] are not the prevailing party with respect to any significant issue for which they sought judicial review under the IDEA" and that, because APS did not timely seek judicial review under the IDEA, Ms. Miller had no need to seek judicial review to protect the awarded relief. Aplt.App. at 484. Ms. Miller does little to dispute this conclusion on appeal. She only argues that APS's noncompliance with the administrative award until February 2006 indicates why it was necessary for her to seek judicial review; her efforts in that regard only could be viewed as unnecessary, she reasons, "after the Court refused APS's request to amend and APS finally complied" with the ordered reimbursement. Aplt. Opening Br. at 42. However, the motion to amend was dependent on the prior existence of the case filed by the Millers, and the refusal to reim-

---

10. The district court also chose not to employ the statutory "[r]eduction in amount of attorneys' fees" applicable where the parent "un- reasonably protracted the final resolution of the controversy," 20 U.S.C. § 1415(i)(3)(F)(i), because both parties took such actions.

burse may well have been related to the pendency of the suits. Ms. Miller's arguments do not refute the district court's conclusion that Ms. Miller did not prevail on any of the issues she raised before the district court. She therefore is not entitled to attorney's fees and costs under § 1415(i)(3)(B) with respect to this case.

Therefore, the district court did not abuse its discretion in awarding limited attorney's fees and costs for the administrative proceedings and denying the other fees and costs requested.

### D. Cross–Appeal

Having rejected Ms. Miller's claims, we turn to the school district's cross-appeal. APS challenges the district court's denial of its motion to amend its answer to state a counterclaim. The proposed counterclaim under § 1415(i)(2)(A) would have presented substantially the same argument as APS's separate lawsuit that the court dismissed for lack of jurisdiction. The counterclaim requested "that the Court enter an Order finding the AAO erred in requiring APS to provide compensatory education, excusing APS from that portion of the AAO's Order and for such other relief as the Court deems just and proper." [11] Aplt.App. at 36.

The district court rejected the counterclaim as futile. on two grounds: (1) "the reimbursement ... that was ordered by the AAO in this case constitutes part of the 'current educational placement' for purposes of IDEA's 'stay put' provision, and ... APS may not avoid or postpone its duty to reimburse the Millers based on the fact that the litigation is still pending," Aplt.App. at 102; and (2) APS previously had conceded that its claim concerning payment for compensatory education would become moot after August 2005 "because the time for reimbursement will have expired," so APS is judicially estopped from asserting a contrary position in this litigation, Aplt.App. at 103.

We ordinarily review a denial of a motion to amend a pleading for abuse of discretion. *See Combs v. PriceWaterhouse Coopers LLP*, 382 F.3d 1196, 1205 (10th Cir.2004); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ("It is settled that the grant of leave to amend the pleadings pursuant to [Fed.R.Civ.P.] 15(a) is within the discretion of the trial court."). However, when denial is based on a determination that amendment would be futile, our review for abuse of discretion includes de novo review of the legal basis for the finding of futility. *See Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239

---

11. We assume *arguendo* that APS's characterization of the AAO's award as compensatory education is correct. A number of circuits have held that the authority to grant equitable relief under the IDEA extends beyond monetary awards to reimburse for services wrongfully denied and includes the power to order the services themselves as "compensatory education." *See Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 522 (D.C.Cir.2005) (collecting cases and concluding that "this extension of *Burlington* to cover services as well as payments makes eminent sense"); *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir.1996) (describing the evolution of the doctrine). We have not ad-

dressed the availability of this remedy yet, *see Moseley ex rel. Moseley v. Bd. of Educ.*, 483 F.3d 689, 693–94 (10th Cir.2007), and we would have no need to do so here. APS does not assert a categorical challenge to the availability of compensatory education; rather, it contests the manner in which the AAO employed this remedy. *See* Aplee. Reply Br. at 11 ("If one accepts the [AAO's] conclusion that compensatory education was needed, an appropriate remedy would have been for the [AAO] to require APS to deliver compensatory education utilizing the methodology that is appropriate to meet the student's needs [at the public school].").

(10th Cir.2001); *Jefferson County Sch. Dist. No. R–1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir.1999).

Yet, before proceeding to the merits, "[w]e are obliged under our independent duty to examine our own jurisdiction" to determine whether APS's cross-appeal is moot. *Moseley ex rel. Moseley v. Bd. of Educ.*, 483 F.3d 689, 693–94 (10th Cir.2007); *see Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000) (noting that "the court must determine whether a case is moot before proceeding to the merits"). We conclude that APS's cross-appeal is moot.

We recently summarized some of the key legal principles underlying the mootness doctrine:

> Article III delimits the jurisdiction of federal courts, allowing us to consider only actual cases or controversies. Accordingly, a plaintiff must possess a personal interest in the outcome of a case at all stages of the proceedings. If, during the pendency of the case, circumstances change such that the plaintiff's legally cognizable interest in a case is extinguished, the case is moot, and dismissal may be required....
>
> In deciding whether a case is moot, "[t]he crucial question is whether granting a present determination of the issues offered ... will have some effect in the real world." When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot.

*Kansas Judicial Review v. Stout*, 562 F.3d 1240, 1245–47 (10th Cir.2009) (alterations in original and citations omitted) (quoting *Davidson*, 236 F.3d at 1182); *see Phelps v. Hamilton*, 122 F.3d 885, 891 (10th Cir. 1997).

On appeal, APS would have us construe the issue as whether the IDEA provides "a mechanism to challenge an award of reimbursement." Aplee. Opening Br. at 48; *see also id.* at 49 ("[T]he district court erred in concluding that there is no mechanism in IDEA for a school district to challenge an administrative hearing officer's award of prospective compensatory education."). However, that was not the issue decided by the district court. Similarly, while APS refers on appeal to its counterclaim as "an action for reimbursement," Aplee. Opening Br. at 49, and asserts that it "seeks reimbursement for money it was ordered to pay as a result of the AAO's erroneous award of equitable relief," Aplee. Reply Br. at 7, what it actually sought in the district court was something quite different.

APS initially sought in its preliminary injunction action to avoid paying the administrative award. Before Ms. Miller filed her appeal from the AAO's decision, APS filed its own case seeking a preliminary injunction to "enjoin Defendants from continuing the provision of private Academic Language Therapy ('ALT') tutoring services for their son." Aplt.App. at 507. APS sought to challenge the AAO's order that APS "reimburse Defendants for ALT tutoring beginning in March 2004 for the remainder of this school year and through this summer," declaring that "if *implemented* [it] will cause APS to suffer irreparable harm." *Id.* at 509 (emphasis added). Once that preliminary injunction effort was rejected by the district court, APS's counterclaim expressed the *same* intent. *See* Aplt.App. at 36 (requesting "that the Court enter an Order finding the AAO erred in requiring APS to provide compensatory education, *excusing* APS from that portion of the AAO's Order" (emphasis added)). It was only *after* the district court rejected its motion to amend that

APS paid what the AAO had ordered it to pay almost a year earlier.

Therefore, it should come as no surprise that the district court's ruling addressed APS's efforts to *avoid compliance at the outset* with its AAO-mandated payment obligations, not the distinct question of whether a procedural avenue exists under the IDEA to challenge the award *after* payment is tendered—*viz.*, whether the IDEA provides a procedural vehicle for APS to attack the award and get a refund after making the payment. *See* Aplt.App. at 101 ("[T]he relevant provisions of the IDEA do not provide a mechanism by which the school district may *avoid or delay* reimbursement for such compensatory education *at this juncture.*" (emphasis added)); *id.* at 102 ("APS may not *avoid or postpone* its duty to reimburse the Millers based on the fact that the litigation is still pending." (emphasis added)); *id.* at 103 ("APS already has incurred a financial obligation to reimburse the Millers in accordance with the AAO's decision and may not *avoid* that result through the counterclaim asserted here." (emphasis added)); *id.* at 106 ("[T]he obligation to reimburse the Millers for the compensatory education awarded by the AAO for the period ending in August 2005 cannot be delayed or reversed *at this juncture.*" (emphasis added)).

Accordingly, we do not view the district court's decision as an assertion that school districts may not challenge administrative awards. That would run into the obvious obstacle of § 1415(i)(2)(A), which permits "[a]ny party aggrieved" to seek district court review of an adverse decision from the IDEA administrative process. Instead, we are called upon to decide here if the district court correctly found APS's counterclaim futile with respect to a narrower legal issue—that is, whether APS *from the outset* could *avoid* any obligation to pay the administrative award of compensatory education.[12]

■ Regarding that question, we conclude that APS's cross-appeal is moot. After the district court denied APS's motion to amend to assert its counterclaim, APS paid the Millers the requisite amounts for compensatory education. We cannot unring that bell. In other words, even if the district court erred in denying APS's motion to amend, we properly could only direct the district court on remand to permit APS to amend to assert a counterclaim to avoid paying for compensatory education—something that APS already has done. "This inability to grant effective relief [to APS] renders this issue moot." *Phelps*, 122 F.3d at 885; *see also Moseley*, 483 F.3d at 689 ("Mr. Moseley argues that the IDEA itself says nothing about a student's claims terminating upon graduation. This may be true, but if Mr. Moseley's claims present no live controversy, they are not justiciable under the Constitution."). Therefore, we dismiss as moot APS's cross-appeal concerning the district court's order denying its motion to amend. *See Phelps*, 122 F.3d at 892 ("We ... dismiss as moot the plaintiffs' appeal of the district court's decision denying their

---

12. APS's reliance on the First Circuit's decision in *Doe v. Brookline Sch. Comm.*, 722 F.2d 910 (1st Cir.1983), therefore is unavailing. APS cites *Doe* for the proposition that "[r]eimbursement of tuition and related services is available to a prevailing party" under § 1415. Aplee. Opening Br. at 48. *Doe* is inapposite because the question under review here is not whether APS would be able to recoup any compensatory-education payments to the Millers if ultimately it was the prevailing party, but rather whether it was obliged to make those payments at the outset pursuant to the AAO's order.

motion to amend their complaint."); *see also Moseley*, 483 F.3d at 694 ("We are obliged ... to dismiss his appeal as moot." (citation omitted)).[13]

## III. CONCLUSION

The district court did not abuse its discretion in declining to hear additional evidence on the IDEA claim, nor did it err in granting summary judgment to APS on the discrimination claims. Furthermore, the district court did not abuse its discretion in assessing Ms. Miller's reasonable attorney's fees and costs. In all these respects, we **AFFIRM** the district court's judgment. Finally, having determined that it is moot, we **DISMISS** APS's cross-appeal for lack of jurisdiction.

---

**13.** We therefore do not need to resolve the thorny legal issues related to whether compensatory education may be deemed a "then-current educational placement" for purposes of the stay-put provisions. 20 U.S.C. § 1415(j) (providing that "during the pendency of any proceedings conducted pursuant to this section ... the child shall remain in the then-current educational placement of such child"); *see Erickson v. Albuquerque Pub. Sch.*, 199 F.3d 1116, 1121 (10th Cir. 1999) (referring to this as the "stay-put provision"). The purpose of this provision is "to prevent school districts from effecting unilateral change in a child's educational program." *Erickson*, 199 F.3d at 1121 (internal quotation marks omitted). It has been construed to impose "an automatic statutory injunction" requiring that the child's then-current educational placement be maintained "at the expense of whatever public entity issued the IEP that is being challenged." *Norman K. ex rel. Casey K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 510–11 (7th Cir.2005). APS argues that the stay-put provision has no application here because the challenged relief is "compensatory education" for a past denial of FAPE rather than an educational placement. This would be an issue of first impression in this circuit, and our survey of the legal landscape reveals few guideposts to aid our resolution of it. In light of our holding concerning mootness, we have no occasion to opine on this issue.